589 A.2d 502

**CHANGING POINT, INC., et al.**

v.

**MARYLAND HEALTH RESOURCES PLANNING COMMISSION, et al.**

**No. 926, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

May 6, 1991.

**152**

Ronald L. Spahn, Columbia, and Kathleen A. Ellis, Baltimore (John R. Metz and Piper & Marbury, Baltimore, and Spahn, Harris, Fila & Colt, Columbia, on the brief), for appellants.

Elizabeth M. Kameen, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Patricia M.C. Brown, Asst. Atty. Gen., on the brief), Baltimore, for appellee, Maryland Health Resources Planning Com'n.

Richard G. McAlee (Weinberg and Green on the brief), Baltimore, for appellee, Mountain Manor East, Inc.

Argued before BISHOP, ROSALYN B. BELL and FISCHER, JJ.

ROSALYN B. BELL, Judge.

This case arises from an application for a Certificate of Need (CON) for alcohol abuse and drug abuse treatment beds. Mountain Manor East (Mountain Manor), appellee, and Mediplex of Maryland Inc. (Mediplex) submitted applications for a CON with the Maryland Health Resources Planning Commission (Commission), appellee. The Commission approved Mountain Manor's application for a CON for a 110–bed facility.

Changing Point, Inc., appellant, an existing treatment facility, appealed to the Circuit Court for Baltimore City. The circuit court affirmed the Commission's determination that a 110–bed facility was needed. The circuit court remanded the case, however, for the Commission to take additional evidence on the separate issue of whether certain individuals had financial or managerial control over Mountain Manor and whether those individuals had engaged in fraud in the past. The Commission held hearings on this issue and again granted Mountain Manor a CON for a 110–bed facility.

Changing Point appealed again to the Circuit Court for Baltimore City. The circuit court affirmed and this appeal followed. On appeal, Changing Point raises the following issues:

—Whether the Commission applied the correct State Health Plan in approving Mountain Manor's CON.

—Whether the Commission's determination that there was a need for a 110–bed adult addiction treatment facility was supported by substantial evidence.

—Whether the Commission's findings regarding the issue remanded to it are supported by substantial evidence.

—Whether the Commission admitted hearsay evidence in violation of the recent decision in *Kade v. Charles H. Hickey School*, 80 Md.App. 721, 566 A.2d 148 (1989).

## FACTS

In 1987, two applicants, Mountain Manor and Mediplex, each submitted to the Commission applications for a CON to develop an intermediate care facility for the treatment of alcoholism and drug abuse.[1] Changing Point, an existing provider of alcohol and drug abuse treatment, was granted

---

1. On March 14, 1987, the Governor signed into law a bill which eliminated the distinctions between alcohol abuse facilities and drug abuse facilities. These two categories of health care services were combined under a new agency, the Alcohol and Drug Abuse Administration. That law became effective January 1, 1988.

status as an interested party in the review of those applications.

An application for a CON must be consistent with the State Health Plan (SHP). The purpose of the SHP is to establish an integrated system of care that "assures geographic and financial access to a range of quality health care services at a reasonable cost for all citizens." COMAR 10.24.14.02A. Specifically, it establishes health care policy to guide the Commission's actions and to foster specific action in the private sector. COMAR 10.24.14.02A(1). It also serves as the legal foundation for the Commission's decisions. The SHP contains policies, standards, and service-specific need projections that the Commission uses in reviewing CON applications. COMAR 10.24.14.02A(2).

The Commission accepted pre-filed direct testimony and conducted protracted hearings on the applications. On March 14, 1989, the Commission approved Mountain Manor's application for a CON for a 110–bed intermediate care facility over Mediplex's application.

Changing Point appealed to the circuit court. It contended that the Commission had violated the legally mandated health planning process. Changing Point argued that the Commission relied on an outdated SHP and an informal, unadopted draft of the SHP.[2] Changing Point also argued that the Commission's determination that there was a need for a 110–bed facility was not supported by the evidence. Finally, Changing Point argued that the Commission erred in excluding relevant "negative evidence" about Mountain Manor, especially in the context of a comparative review process.

The circuit court affirmed the Commission's decision in all respects except as to Changing Point's final argument. The circuit court remanded the case for the Commission to accept and consider this "negative evidence" concerning the

---

**2.** Although it is not clear from the record, it seems that this draft of the SHP was not the one ultimately adopted by the Commission.

convoluted corporate ownership of Mountain Manor and allegations of fraud.[3] In the interest of clarity, we will briefly describe Mountain Manor's corporate ownership and the allegations of fraud.

Mountain Manor is wholly owned by Maryland Treatment Center, Inc. Maryland Treatment Center is wholly owned by American Health Group, Inc., which has two shareholders, Charles Nabit and the Florida Investment Group. The Florida Investment Group is a Maryland limited partnership. One percent of this limited partnership is owned by the Potomac Investment Group as the general partner. The other 99 percent is owned by the Human Service Trust which is an irrevocable trust set up by Dr. Jacob Fishman for the benefit of his children.

Additionally, one-half of the real estate upon which Mountain Manor will be built is owned by the Westport Investment Group. This investment group is owned by Charles Nabit and his father, Merwin Nabit.

During the early 1980s, Merwin Nabit and Dr. Fishman owned Cumberland Psychiatric Hospital through Horizon Health Group Inc. in North Carolina. Dr. Fishman practiced at the hospital through his professional association, Cumberland Psychiatric Associates, P.A. In 1983 and 1984, the hospital and the professional association were investigated for fraud and overbilling under the Civil Health and Medical Program for the Uniform Services (CHAMPUS). In August of 1983, a settlement agreement was signed which required the hospital to pay the government $1,250,-000. Dr. Fishman and Merwin Nabit also agreed that they would not have any interest or control, direct or indirect, in

---

3. There is some question regarding whether the circuit court's order both affirming the decision of the Commission and remanding the case to hear this additional evidence was proper. The propriety of this order, however, is not jurisdictional in nature since the circuit court had the right to affirm the decision of the Commission and had the right to remand the case to the Commission. Additionally, none of the parties to this appeal have raised this issue at any stage of the proceedings. Therefore, we need not and will not address this issue. Rule 8–131(a).

any medical or psychiatric facility owned by Horizon Health Group and located in North Carolina. Dr. Fishman and Merwin Nabit then sold the hospital as required by the settlement agreement.

In April of 1984, in a separate case, Dr. Fishman, individually and on behalf of his professional association, agreed to the entry of a consent order. Under this order, Dr. Fishman and his professional association agreed to pay the government $700,000. Dr. Fishman also agreed not to treat CHAMPUS patients for whom claims would be filed, and not to supervise personnel submitting claims to CHAMPUS for 10 years. The consent order specifically stated, however, that Dr. Fishman was not precluded from being an officer, director or shareholder or from having an ownership interest in any hospital to which CHAMPUS beneficiaries might go.

On remand, the Commission heard evidence regarding whether Dr. Fishman or Merwin Nabit had any direct control over Mountain Manor. It also accepted evidence regarding the CHAMPUS fraud in North Carolina. On March 15, 1990, the Commission again awarded Mountain Manor a 110–bed CON. In the interim, however, a new SHP, limiting a CON to 50 beds, had become effective.

Changing Point again appealed the award of a CON to Mountain Manor. The circuit court affirmed and Changing Point has appealed.

## APPLICABLE SHP

Changing Point contends that the new SHP, which became effective one week prior to the Commission's decision, should apply in this case. It argues that an "adjudicatory body should apply the law in effect at the time of its decision." It cites *O'Donnell v. Bassler*, 289 Md. 501, 508, 425 A.2d 1003 (1981), and *Courtney v. Richmond*, 55 Md. App. 382, 390, 462 A.2d 1223 (1983), for this proposition. These cases do indeed stand for that proposition. That

proposition, however, is no longer a correct statement of the law in Maryland. We explain.

In *Janda v. General Motors Corp.*, 237 Md. 161, 205 A.2d 228 (1964), the Court of Appeals summarized several rules of statutory construction regarding prospective versus retroactive application of statutes. *Janda*, 237 Md. at 168–69, 205 A.2d 228. The fourth rule stated by the Court was that a

> "statute which affects or controls a matter still in litigation when it became law will be applied by the court reviewing the case at the time the statute takes effect although it was not yet law when the decision appealed from was rendered, even if matters or claims of substance (not constitutionally protected), as distinguished from matters procedural or those affecting the remedy are involved, unless the Legislature intended the contrary."

*Janda*, 237 Md. at 169, 205 A.2d 228.

Twenty-three years later, however, in *Washington Suburban Sanitary Commission v. Riverdale Heights Volunteer Fire Co.*, 308 Md. 556, 520 A.2d 1319 (1987), (hereafter *WSSC*), the Court of Appeals reconsidered this proposition of law and stated that "[b]ecause it is inconsistent with the general body of Maryland law on the subject, the fourth rule in *Janda* is disapproved." *WSSC*, 308 Md. at 565, 520 A.2d 1319.

*WSSC* involved a claim against a fire department for negligence in responding to a fire in January of 1980. *WSSC*, 308 Md. at 558, 520 A.2d 1319. In 1983, the Legislature adopted a statute that immunized fire departments from civil liability for negligence. *WSSC*, 308 Md. at 557–58, 520 A.2d 1319. The claim against the fire department was filed 14 months after the statute's effective date. *WSSC*, 308 Md. at 558, 520 A.2d 1319.

The Court held that the statute did not apply to tortious conduct occurring before the statute's effective date. *WSSC*, 308 Md. at 558, 520 A.2d 1319. The Court noted

that ordinarily statutes are given a prospective application, unless there is a clear legislative intent to the contrary. *WSSC,* 308 Md. at 568, 520 A.2d 1319. Furthermore, the Legislature knows how to express its intent that a statute have a retrospective application. *WSSC,* 308 Md. at 568, 520 A.2d 1319.

In the instant case, because neither the language of the new SHP nor its history indicate that it should be applied retroactively, the new SHP should be applied prospectively only. Therefore, the new SHP should not apply to this application for a CON. Applying the new SHP would clearly give the SHP a retroactive effect.

Even if the fourth rule in *Janda* controlled, Changing Point would not prevail. That rule clearly states that the law in effect at the time of the decision applies, unless the Legislature intended to the contrary. *Janda* 237 Md. at 169, 205 A.2d 228.

In the instant case, the new SHP provides that a CON will be approved only for up to 50 adult intermediate care facility beds. COMAR 10.24.14.05E(3). This limit was apparently arrived at by using the "Bed Need Projection Methodologies" contained in COMAR 10.24.14.07. The number of intermediate care facility beds needed in the future is calculated by subtracting the existing intermediate care facility beds from the gross number of intermediate care beds needed in the area. COMAR 10.24.14.07B(7)(j).

Table 3 of COMAR 10.24.14 sets forth an inventory of existing private intermediate care facility beds which includes Mountain Manor's CON for 110 beds. Thus, the bed need projection assumes that the Mountain Manor project would be built based on criteria different from the new SHP. It is apparent that the Commission intended Mountain Manor to be built under the criteria by which it was originally certified. The Commission's intent clearly contradicts any presumption that the new SHP should apply in this case.

 Moreover, an agency is best able to discern its intent in promulgating a regulation. *Maryland Comm'n on Human Relations v. Bethlehem Steel Corp.*, 295 Md. 586, 593, 457 A.2d 1146 (1983). Thus, an agency's interpretation of the meaning and intent of its own regulation is entitled to deference. *Maryland Comm'n*, 295 Md. at 593, 457 A.2d 1146. In the case *sub judice*, the Commission's decision not to apply the new SHP was based on its interpretation of the intent of the new regulatory structure. Giving due deference to this interpretation, we hold that the Commission applied the correct SHP.[4]

 Changing Point argues that to allow the Commission to apply the previous SHP would violate the Commission's statutory authority. Maryland Health–Gen.Code Ann. § 19–118(c)(1) (1982, 1990 Repl.Vol.), provides that "[a]ll decisions of the Commission on an application for a certificate of need ... shall be consistent with the State health plan and the standards for review established by the Commission." Changing Point argues that the Commission's decision in this case is not consistent with the current SHP. We disagree.

Mountain Manor's 110–bed CON was taken into account in devising that SHP. The new SHP explicitly includes Mountain Manor's CON. Thus, the Commission's decision to reaffirm this award of a CON is not inconsistent with the new SHP.

 Changing Point further argues that this interpretation of the applicable SHP is, in essence, an advance deter-

---

**4.** We find it interesting to note that the circuit court order of December 26, 1989 required the Commission to hear the evidence regarding Mr. Nabit and Dr. Fishman within 45 days of the date of the order. The order also required the Commission to issue its findings and conclusions within 60 days of the date of the order. The new SHP became effective March 8, 1990. Thus, had the Commission followed the order of the circuit court, the issue of whether the new SHP applied would not have arisen. It would be ironic to require Mountain Manor to suffer the consequences of the Commission's inefficiency.

mination to approve Mountain Manor's CON upon the conclusion of the remand. This is patently untrue. If the evidence had shown that Merwin Nabit and Dr. Fishman had financial or managerial control over Mountain Manor and that they were guilty of fraud, the application for a CON would have been denied, regardless of which SHP applied. We find no error in the Commission's application of the previous SHP to the case at bar.

Mountain Manor argues that the remand was limited and that the Commission was constrained to comply strictly with the remand instruction. Because the remand was limited to the issues of financial and managerial control and fraud, Mountain Manor argues it would have been improper for the Commission to reevaluate the entire application in light of the new SHP. Because we hold the Commission applied the appropriate SHP, we need not address this argument.

## SUBSTANTIAL EVIDENCE

Changing Point argues that the Commission erroneously concluded that there was a need for 110 intermediate care facility beds in Southern Maryland. Changing Point also argues that the Commission erroneously concluded (1) that the allegations of fraud against Dr. Fishman and Merwin Nabit were irrelevant to the application and (2) that they were innocent of any wrong doing. We disagree and explain.

### —Scope of Review—

■ Judicial review of the Commission's findings of fact is limited to whether its conclusions are supported by substantial evidence. *Sinai Hospital v. Maryland Health Resources Planning Comm'n*, 306 Md. 472, 478, 509 A.2d 1202 (1986). "[T]he test is a deferential one, requiring 'restrained and disciplined judicial judgment so as not to interfere with the agency's factual conclusions.'" *State Administration Board of Election Laws v. Billhimer*, 314 Md. 46, 58–59, 548 A.2d 819 (1988), *cert. denied*, 490 U.S.

1007, 109 S.Ct. 1644, 104 L.Ed.2d 159 (1989), quoting *Supervisor of Assessments of Montgomery County v. Asbury Methodist Home*, 313 Md. 614, 625, 547 A.2d 190 (1988). An agency's decision will be upheld if "a reasoning mind reasonably could have reached the factual conclusion the agency reached." *Bulluck v. Pelham Wood Apartments*, 283 Md. 505, 512, 390 A.2d 1119 (1978).

—Finding of Need—

■ Changing Point argues that the Commission erred when it concluded that there was a need for a 110–bed intermediate care facility. Changing Point specifically alleges that the Commission erred by relying solely on mathematical calculations while ignoring market evidence that demonstrated no need for additional beds. We disagree and explain.

In its decision, the Commission noted that the Alcoholism and Alcohol Abuse State Health Plan had identified a need for 69 additional beds for alcoholism treatment in Southern Maryland. The Commission then determined that the SHP alcoholism bed need methodology could be appropriately applied to the drug abusing population. That methodology indicated a need for 63 additional beds for drug treatment in Southern Maryland.[5]

Changing Point does not challenge this need methodology. It complains that the validity of the mathematical calculations was not reflected in "market place" evidence. The Commission fully considered that point in its decision. As the Commission explained, evidence of market place demand for services existed in the record:

> "[T]here is evidence of excess demand. The evidence shows that occupancy at Greater–Laurel Beltsville Hospital often exceeds its licensed capacity. Changing Point South itself has also experienced high levels of utilization for a facility in its start-up phase. And there is also

---

5. The 110–bed CON granted to Mountain Manor includes both alcoholism treatment beds and drug abuse treatment beds.

anecdotal evidence. For example, Michael Fuller, Director of the Addictions Division of the Prince George's County Health Department, stated: 'I've been in this business for 18 years, and I can't think of a time when it is as bad as it is right now—where the demand for treatment is far outpacing our ability to deliver services.' *The Washington Post,* February 26, 1988, A8 (Schwermer Exhibit I)."

Additionally, the Commission reviewed reports which analyzed drug and alcohol abuse in Maryland. These reports included: *Trends and Patterns in Drug Abuse in Maryland: Fiscal Year 1985; The Extent of Alcohol and Drug Abuse in the State of Maryland* (July 2, 1986); a Rand Corporation study titled *Drug Use and Drug Programs in the Washington Metropolitan Area: An Assessment* (February 1988); the Commission's draft SHP on Alcoholism and Drug Abuse Treatment Services, November 24, 1987; and *1984 Survey of Drug Abuse Among Maryland Adolescents—General Report.* Each report provided evidence of the prevalence of the substance abuse problem in Maryland.

Of all those studies, Changing Point apparently considers the Rand Corporation study most persuasive. Changing Point asserts that the study found no need for additional residential services.[6] The Commission fully considered Changing Point's position on the Rand Corporation study in its decision and responded:

"[Changing Point] cites a passage in the report which questions residential treatment as the most cost-effective treatment. The Rand Report is a useful source of information about drug abuse problems and the use of public funds in treating the problem in the Washington area. It is not, however, a substitute for the planning and methodological determinations that must be made by this Commission in the Southern Maryland area."

---

6. Changing Point has not made that study a part of the Joint Record Extract nor has it cited to the part of the study that actually states that no need for additional residential services exists.

Moreover, statistics and studies were not the only evidence the Commission relied on to find that a need for services existed. The Commission listened to the testimony of witnesses who explained that, although the need for services was high, the demand for services could still appear low. Those witnesses testified that demand was governed by several factors. These factors include the existence of inadequate outreach programs; financial constraints to treatment which affect even the insured; and the inability of the medically indigent to obtain services in the private sector. Thus, while the need for services is high, the population in need of those services may not have access to those services.

The approval of the Mountain Manor project, the Commission noted, would address those demand issues. The Mountain Manor project contained specific features to address the problem of access. Specifically, Mountain Manor had an outreach program designed to inform the public of the services available to it. Mountain Manor had also pledged to treat a "significant percentage"[7] of indigent patients.

Given this evidence, "a reasoning mind reasonably could have reached the factual conclusion" the Commission reached. *Bulluck*, 283 Md. at 512, 390 A.2d 1119. The Commission's determination that there was a need for a 110–bed intermediate care facility was not in error.

—Issues on Remand—

■ Changing Point argues that the Commission erred in finding that neither Merwin Nabit nor Dr. Jacob Fishman were directly involved in the financial or managerial control of Mountain Manor. Changing Point also argues that the Commission erred in finding that the consent order and settlement agreement did not prove Merwin Nabit and Dr.

---

7. Mountain Manor pledged that at least 10 percent of its patients would receive free care. It projected 10 percent of gross revenue as totally free care. It also projected an additional five percent of gross revenue as bad debt and projected 19 percent of gross revenue as partial payment and contractual allowances.

Fishman were guilty of fraud. If either Dr. Fishman or Merwin Nabit were guilty of fraud and had financial or managerial control over Mountain Manor, Changing Point argued that that facility could not be certified to provide services in Maryland. Specifically, Changing Point argues that Mountain Manor would not be consistent with financial viability criterion, COMAR 10.14.01.07H(2)(d), nor with the criterion which requires compliance with all laws. COMAR 10.14.10.07H(2)(h).

—Relationship of Merwin Nabit to Mountain Manor—

Merwin Nabit is the father of Charles Nabit. Charles Nabit is the president of Maryland Treatment Center Inc., which owns Mountain Manor. Charles Nabit stated in uncontradicted testimony that Merwin Nabit has no ownership interest in Maryland Treatment Center or any of its parent or subsidiary corporations. He also stated that Merwin Nabit is not an officer or director of any of these corporations.

Merwin Nabit and Charles Nabit own Westport Investment Group. Westport owns 49.5 percent of Glendale Limited Partnership, which in turn owns the property on which Mountain Manor will be built. As a partner in Westport, Merwin Nabit would have no management responsibility or authority relating to Mountain Manor. Charles Nabit testified, "I can tell you to a substantial certainty that my father will have no role in the Mountain Manor East project in terms of the operations."

The Commission's determination that any allegations of fraud on the part of Merwin Nabit was not relevant to Mountain Manor's application for a CON was entirely logical. Because he would have no control, authority, responsibility or direct interest in Mountain Manor, his previous conduct could have no impact upon Mountain Manor's ability to meet the Commission's criteria. We hold that the Commission did not err in this finding.

—Relationship of Dr. Fishman to Mountain Manor—
—Financial Control—

■ The relationship of Dr. Fishman to Mountain Manor is more complex. While Dr. Fishman has no direct ownership interest in Mountain Manor, there was some evidence that he has an indirect ownership interest. Dr. Fishman had set up an irrevocable trust, for the benefit of his children, called the Human Service Trust. This trust, in turn, owned 99 percent of Florida Investment Group. Florida Investment, in turn, owns 50 percent of American Health Group which owns 100 percent of Maryland Treatment Center, Inc. Maryland Treatment Center owns 100 percent of Mountain Manor.

Additionally, Florida Investment Group owns 49.5 percent of Glendale Limited Partnership. That partnership, in turn, owns the real estate upon which Mountain Manor will be built.

Changing Point alleges that Dr. Fishman, in fact, had direct control over the assets of the Human Service Trust which, through its various holdings, owned Mountain Manor. Thus, Changing Point argues that Dr. Fishman does have a direct financial interest in Mountain Manor. There was evidence, however, that Dr. Fishman does not control the assets of the Human Service Trust. The trust agreement itself states that the trust is irrevocable. It specifically states that no part of the principal or income may ever revert to Dr. Fishman. The trust appoints two "non-family" and four "family" trustees. Dr. Fishman, however, is not a trustee and relinquishes all control over the trust and its assets once the trust takes title to the assets. Moreover, Dr. Fishman testified that the trust had been set up as part of an estate plan to avoid excessive estate taxes at his death. He further testified that any assets that are transferred to the trust are transferred only upon the advice of his accountants and lawyers to get the best tax advantage.

Changing Point further argues that Dr. Fishman has financial control over Mountain Manor because he controls

assets, through the trust, which are necessary for Mountain Manor to meet the financial feasibility criteria contained in COMAR 10.24.01.07H(2)(d). The Commission, however, in reviewing the financial feasibility of Mountain Manor, directly refuted such an argument. It stated that Mountain Manor's financial feasibility was not based on any assets owned directly or indirectly by Dr. Fishman. Instead, financial feasibility was based on reasonable projections of funds otherwise available for capital costs, financing costs and other cash requirements, as well as reasonable projections of operating costs and revenues. Furthermore, the Commission found that Mountain Manor relied on the financial reputation of Charles Nabit in securing loans and other project financing.

In sum, there was substantial evidence from which the Commission could have reasonably concluded that Dr. Fishman had no financial control over Mountain Manor.

—Managerial Control—

■ Changing Point also argues that the Commission erred in finding that Dr. Fishman would have no managerial control in Mountain Manor. Three Mountain Manor witnesses testified at length on this issue: Dr. Fishman, Charles Nabit, and Mary Roby, Executive Vice President of Maryland Treatment Center. The Commission's decision states:

"Dr. Fishman testified that he has no personal ownership interest in [Maryland Treatment Center], is not an officer or director of [Maryland Treatment Center] or any corporations affiliated with it, is not an employee of [Maryland Treatment Center], is not on the medical staff of any of the facilities associated with [Maryland Treatment Center], does not treat patients at Mountain Manor or Baltimore Treatment Center, and does not send patients to or get referrals from Mountain Manor or Baltimore Treatment Center."

The Commission also explained that Dr. Fishman

"further testified that he acts as a consultant and advisor in the areas of accreditation, quality assurance, life safety

code, staff training and 'some general clinical and program treatment issues.' He also stated he has no executive authority of any kind over operations at Mountain Manor or at Baltimore Treatment Center. This description was corroborated by the testimony of Charles Nabit and Mary Roby. In addition, Mary Roby testified that Dr. Fishman has had 'no involvement' in developing written policies regarding billing practices and has '[n]ot in any way' been involved in the billing practices at Mountain Manor."

Moreover, while Mary Roby candidly admitted that she considered Dr. Fishman to be a mentor, she also testified that he had no power to command, control, or dictate the operation of Maryland Treatment Center facilities. Although she consulted Dr. Fishman, she had complete autonomy as Executive Vice President.

In addition to acting as a consultant, Dr. Fishman, together with Merwin Nabit, acted on behalf of Maryland Treatment Center in negotiating the acquisition of stock of W.R. Management, a District of Columbia based corporation. W.R. Management was involved in a CON proceeding for a drug and alcohol abuse program in the District. In its decision, the Commission stated:

"Jacob Fishman and Charles Nabit confirmed in testimony that Dr. Fishman and Merwin Nabit had acted on behalf of [Maryland Treatment Center] in the matter. Charles Nabit also explained that Dr. Fishman and Merwin Nabit, rather than he, conducted the negotiations because they 'are quite experienced in negotiations of that type and are more experienced in matter [sic] of the District generally....'"

Charles Nabit also testified that he could not define Dr. Fishman's future role at Mountain Manor. He did state, however, that it would be no greater than his past role as a program consultant. He further testified that there was good reason to expect that, in many ways, Dr. Fishman's role would diminish.

In light of this evidence, the Commission reasonably could have concluded that Dr. Fishman would have no role in the management, direction or control of Mountain Manor. There was substantial evidence that he would have no influence on the operation of Mountain Manor, no impact on its billing practices or its day-to-day decision making processes, nor would Dr. Fishman refer patients to or treat patients at Mountain Manor. Thus, we hold there was no error in the Commission's finding that Dr. Fishman would not managerially control Mountain Manor.

Whether Dr. Fishman or Merwin Nabit had engaged in fraudulent CHAMPUS billing in North Carolina would be relevant to the Commission's decision only if they maintained financial or managerial control over Mountain Manor. We have held that the Commission did not err in finding that neither had financial or managerial control. Therefore, we need not and will not address the issue of whether the Commission erred in finding that they were innocent of any wrongdoing.

## HEARSAY

Changing Point argues that a number of documents and certain testimony constituted hearsay evidence admitted by the Commission in violation of *Kade v. Charles H. Hickey School,* 80 Md.App. 721, 566 A.2d 148 (1989), *supra.* Changing Point has been less than helpful, however, in identifying the evidence it finds objectionable and in explaining how that evidence violates *Kade.* In its brief, Changing Point discusses only two pieces of evidence. One was a cover letter by Herbert Goldman, Esq., which was attached to a number of documents that the Commission ordered Mountain Manor to produce. The other was the testimony of Dr. Fishman's counsel in North Carolina who testified without producing his files. Changing Point also points to its "Supplemental Memorandum in Support of Renewed Motion Concerning the Admissibility of Hearsay Evidence" as further examples of hearsay admitted in violation of *Kade.* This memorandum refers to certain pages of

the testimony of Charles Nabit, several exhibits, and the "hearsay testimony of Mary Roby and Charles Nabit on January 25, 1990." This memorandum, like Changing Point's brief on this appeal, fails to explain how this evidence constitutes hearsay.

It is neither our responsibility nor inclination to investigate and construct an argument on behalf of an appellant. Therefore, we will confine our analysis to that evidence specifically discussed in Changing Point's brief. *See Rosenberg v. Rosenberg,* 64 Md.App. 487, 515 n. 7, 497 A.2d 485, *cert. denied,* 305 Md. 107, 501 A.2d 845 (1985).

Changing Point argues that the *Kade* decision changed and limited the admissibility of hearsay evidence in an administrative proceeding. We disagree. *Kade* clarified the law, but did not change it.

*Kade* involved Don–Neil Kade's appeal of a three-day suspension from his position as a Youth Supervisor II at the Charles H. Hickey School. *Kade,* 80 Md.App. at 723, 566 A.2d 148. At a hearing conducted before the Department of Personnel, the hearing officer admitted into evidence the written statements of two of Kade's co-workers and several students. *Kade,* 80 Md.App. at 724, 566 A.2d 148. The co-workers' statements were not made under oath and the students' statements did not contain the students' ages, addresses or other descriptive information regarding them. *Kade,* 80 Md.App. at 724, 566 A.2d 148. This Court held that this unreliable hearsay evidence did not support the Department's decision and reversed the Department's order affirming Kade's suspension. *Kade,* 80 Md.App. at 728, 566 A.2d 148.

This Court noted that hearsay may be the sole basis for an agency's decision if the hearsay is credible and probative. *Kade,* 80 Md.App. at 725, 566 A.2d 148. To be admissible, however, hearsay must be competent and have probative force. *Kade,* 80 Md.App. at 725, 566 A.2d 148. This Court observed that "the administrative agency 'must observe the basic rules of fairness as to parties appearing

before them.' " *Kade,* 80 Md.App. at 726, 566 A.2d 148, quoting *Dal Maso v. Board of County Comm'rs,* 238 Md. 333, 337, 209 A.2d 62 (1965).

Changing Point argues that the January 5, 1990 letter from Herbert Goldman should not have been admitted. It complains that, rather than producing the documents about Dr. Fishman's relationship to Mountain Manor ordered by the Commission, Mountain Manor had Mr. Goldman draft a letter summarizing those documents. Changing Point also complains that it did not have the opportunity to cross-examine Mr. Goldman on this information. It also asserts that the Commission relied on the Goldman letter in its decision. These allegations are unfounded.

Mr. Goldman's letter was merely a cover letter. The documents which the Commission had ordered Mountain Manor to produce were attached to the letter. The letter, itself, simply described the documents attached to it.

One of the attached documents was the trust agreement which created the Human Service Trust. Changing Point argues that, because it had no opportunity to cross-examine Mr. Goldman on the terms of the trust, *Kade* was violated. The trust agreement itself, however, was available for Changing Point to examine or to have other experts examine and testify about the agreement's terms. Moreover, Changing Point had every opportunity to cross-examine Dr. Fishman, who knew the most about the trust.

Furthermore, there is no indication that the Commission relied on the Goldman letter in concluding that there was no direct relationship between Dr. Fishman and Mountain Manor. The Commission's decision relied on the testimony of Dr. Fishman, Charles Nabit and Mary Roby, not the Goldman letter. Therefore, we hold that the admission of Mr. Goldman's letter was not a violation of the principles of *Kade.* The Commission did not violate the basic rules of fairness to the parties appearing before it. *Kade,* 80 Md. App. at 726, 566 A.2d 148.

 Changing Point also argues that Dr. Fishman's counsel in North Carolina was allowed to testify through hearsay about the North Carolina events without producing his files. Dr. Fishman had waived the attorney-client privilege to allow his attorney, Gerald Feffer, to testify about the legal proceedings regarding the allegations of CHAMPUS fraud in North Carolina. Whether Mr. Feffer's testimony was hearsay is not important as it was merely cumulative.

Moreover, Changing Point cites no authority, and we can find none, to support the proposition that Mr. Feffer should have produced his files. The *Kade* decision certainly does not support such a proposition. Additionally, the Commission's rules of procedure do not provide for discovery of this type of document by the parties. Finally, the failure to produce these files in no way prevented Changing Point from cross-examining Mr. Feffer. The Commission did not err in allowing Mr. Feffer to testify without producing his files.

## CONCLUSION

We hold that the Commission applied the correct SHP in granting Mountain Manor's application for a 110–bed CON. We also hold that the Commission's decision was supported by substantial evidence. Additionally, we hold that the Commission did not admit hearsay evidence in violation of the *Kade* decision.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.