689 A.2d 1247

The STATE BOARD OF ARCHITECTS

v.

James CLARK.

No. 633, Sept. Term, 1996.

Court of Special Appeals of Maryland.

Feb. 27, 1997.

Peter M.D. Martin, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, Jonathan Krasnoff and Milena Trust, Assistant Attorneys General, on the brief), Baltimore, for Appellant.

Charles R. Diffenderffer (Brown & Diffenderffer, L.L.P., on the brief), Towson, for Appellee.

Argued before FISCHER, DAVIS and SALMON, JJ.

## OPINION

SALMON, Judge.

The State Board of Architects (The Board or appellant) held a hearing on January 25, 1995, concerning James R. Clark (appellee), an architect. In a Memorandum and Order dated February 22, 1995, the Board found that Clark aided and abetted R. Thomas Vincent, an unauthorized person, to practice architecture and that Clark knowingly violated a provision of the Code of Ethics by signing and sealing drawings for which he did not have direct professional knowledge and direct supervisory control.[1] The Board suspended Clark's license to practice architecture for two years and ordered him to pay a $400 penalty.

---

1. Clark was charged with violating sections 3–311(a)(1)(vi) and 3–311(a)(1)(iv) of the Maryland Architects Act, Md.Code Ann., Bus. Occ. & Prof. §§ 3–101 to 3–701 (1995 Repl.Vol. & Supp.1996), and Code of Maryland Regulations (COMAR) 09.21.01.05E(1).

Clark appealed to the Circuit Court for Kent County. After a hearing before Judge J. Frederick Price, the court reversed the Board's decision in a Memorandum and Order dated January 23, 1996. The Board timely appealed and raises the following questions, which we have rephrased:

1. Was the Board wrong as a matter of law in finding that Clark aided and abetted the unlicensed practice of architecture?

2. Was the Board wrong as a matter of law in finding that Clark signed and sealed drawings for which he did not have direct professional knowledge and direct supervisory control? [2]

## I. STANDARD OF REVIEW

In *Ahalt v. Montgomery County*, 113 Md.App. 14, 20–22, 686 A.2d 683 (1996), we said:

Our role in reviewing an administrative decision is "precisely the same as that of the circuit court." *Dep't of Health & Mental Hygiene v. Shrieves*, 100 Md.App. 283, 303–304, 641 A.2d 899 (1994). Like the circuit court, we must review the administrative decision itself.

"Judicial review of administrative agency action is narrow." *United Parcel Serv., Inc. v. People's Counsel*, 336 Md. 569, 576, 650 A.2d 226 (1994). In reviewing the Board's decision, this Court must not engage in judicial fact-finding. Nor may we supply factual findings that were not made by

---

**2.** The questions framed by appellant were as follows:

1. Did the Circuit Court for Kent County erroneously apply the "question of law" standard of review when the case involved the factual questions of whether Clark's actions constituted the illegal aiding and abetting of an unlicensed person and the failure to have direct knowledge and supervisory control of that person's work?
2. Did the Circuit Court for Kent County err in reversing the Board's decision based on an inapplicable statutory section and in failing to give deference to the Board's expertise in interpreting its regulation?

Because this case involves review of an administrative decision, it is the Board's decision that we review, not the decision of the circuit court. *See infra* section I.

the Board. Moreover, this Court may not uphold the agency's decision "unless it is sustainable on the agency's findings and for the reasons stated by the agency." *United Parcel Serv., Inc.*, 336 Md. at 577, 650 A.2d 226 (quoting *United Steelworkers v. Beth. Steel*, 298 Md. 665, 472 A.2d 62 (1984)).

Factual findings made by an agency are binding upon a reviewing court, so long as they are supported by substantial evidence. Substantial evidence has been defined as more than a scintilla of evidence. Further, the inferences reasonably to be drawn from the facts are also left to the Board. " 'The Court may not substitute its judgment on the question whether the inference drawn is the right one or whether a different inference would be better supported. The test is reasonableness, not rightness.' " *Snowden*, 224 Md. at 448, 168 A.2d 390 (citations omitted). Moreover, an appellate court must "review the agency's decision in the light most favorable to the agency, since decisions of administrative agencies are prima facie correct and carry with them the presumption of validity." *Baltimore Lutheran High Sch. Ass'n v. Employment Sec. Admin.*, 302 Md. 649, 662-663, 490 A.2d 701 (1985).

In contrast to findings of fact, however, an agency's conclusions of law are not entitled to deference. The Board's decision is not lawful if it is arbitrary, illegal, or capricious. As we said in *Mortimer v. Howard Research*, 83 Md.App. 432, 441, 575 A.2d 750 (1989), a decision is "not in accordance with law" when it is

> arbitrary, illegal or capricious. In making a determination of whether the [agency] decision is arbitrary, illegal or capricious, the reviewing court must decide whether the question before the agency was fairly debatable. An issue is fairly debatable if reasonable persons could have reached a different conclusion on the evidence, and if so, a reviewing court may not substitute its judgment for that of the administrative agency. The fairly debatable test is analogous to the clearly erroneous standard under Rule 8-131(c) and a decision is fairly debatable if it is sup-

ported by substantial evidence on the record taken as a whole.

(Citations omitted.)

## II. FACTS [3]

James R. Clark (Clark) has been licensed as an architect in Maryland since July 24, 1991. He is also licensed as an architect in Massachusetts, Delaware, and Virginia.

Sometime in 1990 or 1991, Dr. Harry Ross, a resident of Chestertown, Maryland, contacted R. Thomas Vincent (Vincent), who was not licensed as an architect but who was a trained draftsman and the manager of a lumber mill. Dr. Ross asked that Vincent "draw up plans" for a second story addition to an office building owned by him in Chestertown, Maryland (hereinafter the Dr. Ross building). Afterward, he also asked Vincent to draw up plans for a building to house a TCBY yogurt store, for which he had obtained a franchise.

### A. The Dr. Ross Building

Vincent prepared a hand drawing, on November 10, 1991, of the floor plans for a second story addition to the Dr. Ross building. On December 15, 1991, with the assistance of two other draftsmen, Vincent prepared an additional hand drawing of the floor plans as well as an "end view" drawing and an "elevation" drawing of the front and rear of the structure. Vincent testified that the purpose of the drawings was to "prepare a building materials estimate" from which he hoped to secure Dr. Ross's business (i.e., he hoped Dr. Ross would purchase building materials from him). At the time that Vincent dated and initialed the drawings, Clark had no knowledge of Vincent's actions.

Vincent's drawings for the Dr. Ross building were submitted to the Town Manager of Chestertown, Mr. William Ingersol, for a permit. The drawings were also provided to the Gorsuch Construction Company for use in the construction of

---

3. The facts in this section are undisputed.

the addition. The drawings were, at the request of Mr. Ingersol, also submitted to the State Fire Marshall for review. The Office of the State Fire Marshall, in a letter to Vincent, required six changes to the plans from a "fire protection standpoint." In response, Vincent prepared an addendum to the drawings. No architect, including Clark, was involved in this revision. The revisions were submitted to, and approved by, the State Fire Marshall. On October 29, 1992, the Town of Chestertown approved a building permit for construction of a second story addition to the Dr. Ross building.

### B. The TCBY Project

Vincent advised Dr. Ross that he could prepare a "sketch" for the "shell building" of a TCBY store but that he could not prepare drawings to secure a building permit. On February 1, 1993, Vincent prepared a "rough" pencil sketch for the shell building by copying a floor plan previously supplied by TCBY and "roughing out some things." No architect, including Clark, had any involvement with or knowledge of the drawing at the time of its preparation. Vincent's drawing was attached to the building permit application submitted to the Town of Chestertown by Dr. Ross. A permit for construction of a 20' × 70' building to be used for a TCBY store was issued on April 27, 1993.

### C. Vincent's Contact with Clark

In the late spring or early summer of 1993, Mr. Ingersol, the Town Manager who had previously approved the permits for the Dr. Ross building addition and the TCBY project, told Vincent that due to a new building code all the drawings needed to be brought "up to code."

Vincent contacted Clark and asked if he would sign and seal the drawings he had prepared for the TCBY project. Clark testified, in regard to his initial involvement with Vincent, as follows:

> Well, Tom Vincent called me up—I didn't know Tom Vincent from Adam—and asked me if I'd seal a drawing for him, and I said, we don't do that.... I got to talking to

him, and he was referred to me by one of my best clients, Carl Williams .... I thought ... I owe a lot to Carl Williams and I think I'll [ ] do this for him, but I—you know, I obviously was thinking about just redrawing his whole project. He brought it over to me, I looked at it, and I thought, hey, this guy has got a little bit on the ball, and I just—I, I had my Mylar out and I was ready to put the title block on it and start [ ] over, but he had some things on there that were pretty good.... So I just went over the whole drawing and re-drew it as I thought necessary and it was done.

Clark stated that he "did a thorough code check" and reviewed the drawing "every way you're supposed to review it." After drawing over certain portions of Vincent's work and determining that the drawing was correct, Clark again stamped the drawings with the stamp issued to him by the Board and signed the drawings.

Vincent paid Clark $200 for the services he provided with respect to the TCBY project. When asked whether he had direct professional knowledge or supervisory control over the creation of the TCBY drawing, Clark responded:

If I move over the top of this drawing, it's mine. I looked at it ... I thought it was right ... I checked all the [ ] structure in it, and there was very little structure to check because it's [ ] a trussed building.

Approximately six weeks later, in June 1993, Vincent contacted Clark regarding the drawings of the Dr. Ross building addition. He advised Clark that the drawings needed to be "checked" in order to bring the building up to code. After reviewing the drawings and making several notations and corrections, Clark again stamped the drawings with the stamp issued to him by the Board, signed his name across the stamp, and dated each drawing June 17, 1993. According to Vincent's testimony before the Board, the following changes to the Dr. Ross building addition, which was already under construction, were made as a result of Clark's input:

[T]he support under the corridor on the second floor was not spaced properly. He changed some spanning dimensions, added ... the fire walls in the stairway, moved the handrail heights ... and the handrail at the ... end stairway.

In order to follow Clark's specifications, work that had already taken place had to be "ripped out and rearranged."

At the administrative hearing, Clark testified that he viewed his actions regarding the Dr. Ross building as the preparation of a "code report," and that he sealed the drawings as he would have "sealed" a code report in letter form. Vincent paid Clark $200 for the services he provided with respect to the Dr. Ross building addition.

Upon review of the aforementioned undisputed facts, the Board, without any explanatory analysis, made the following conclusions of law:

1. James Clark aided and abetted R. Thomas Vincent, an unauthorized person, to practice architecture in violation of the Business and Occupations and Professions Article, § 3–311(a)(1)(vi), Annotated Code of Maryland.

2. James Clark knowingly violated a provision of the Code of Ethics adopted by the State Board of Architects in violation of Business and Occupations and Professions Article, § 3–311(a)(1)(iv), Annotated Code of Maryland.[4]

3. James Clark signed and sealed drawings for which he did not have direct professional knowledge and direct supervisory control in violation of COMAR 09.21.01.05E(1).

### III. DISCUSSION

**Issue 1:** Was the Board wrong as a matter of law in finding that Clark aided and abetted the unlicensed practice of architecture?

---

4. The second and third violations are in reality one and the same because the code of ethics provision allegedly violated is COMAR 09.21.01.05E(1).

 Section 3–311(a)(1)(vi) of the Business Occupations and Professions Article states that the Board may suspend or revoke an architect's license for aiding or abetting an unauthorized person to practice architecture. Md.Code Ann., Bus. Occ. & Prof. § 3–311(a)(1)(vi) (1995 Repl.Vol.). In *Anello v. State*, 201 Md. 164, 168, 93 A.2d 71 (1952), the Court of Appeals defined the terms "aider" and "abettor":

> The legal definition of the word "aider" is not different from its meaning in common parlance. It means one who assists, supports or supplements the efforts of another. The word "abettor" means in law one who instigates, advises or encourages the commission of a crime.... To be an aider or abettor, it is not essential that there be prearranged concert of action, although, in the absence of such action, it is essential that one should in some way advocate or encourage the commission of the crime.

*See also* 1 Charles E. Torcia, *Wharton's Criminal Law* § 29, at 181 (15th ed. 1993) ("To 'aid' is to assist or help another. To 'abet' ... [i]n its legal sense ... means to encourage, advise, or instigate the commission of a crime.").

The Board's conclusion that Clark aided and abetted Vincent to practice architecture is not supported by substantial evidence because the undisputed facts show that any unauthorized practice of architecture by Vincent took place prior to Clark's involvement with either of the projects. Indeed, the Board acknowledged that "no architect" had any knowledge of either the TCBY or office addition drawings at the time Vincent prepared them. It was these drawings, prepared by Vincent, that were submitted along with both permit applications, and it was not until after the permits were granted [5] that Mr. Ingersol told Vincent that the previously approved projects needed to be brought "up to code" and Vincent first contacted Clark. Thus, by the time Clark became involved with the TCBY project, the building permit based on Vincent's

---

5. The permit for the Dr. Ross building addition was granted on October 29, 1992, while the permit for the TCBY project was granted on April 27, 1993.

drawings had already been issued. Likewise, Clark did not become involved with the Dr. Ross building addition project until June 1993, eight months after the building permit was issued.

On cross-examination, Vincent confirmed that Clark had no knowledge of either of the projects prior to the time that Vincent brought the plans to him.

Q Would you say, sir, that Mr. Clark had direct professional knowledge of both of these projects?

A After the plans were taken to him, yes.

Q He couldn't know about them before, could he?

A He had no way of knowing about them.

Clearly, Clark could not aid, abet, advocate or encourage the commission of an alleged wrong (the unauthorized practice of architecture) that took place without his knowledge or involvement. There was no evidence, substantial or otherwise, that Clark aided and abetted Vincent to practice architecture. Thus, we hold that the Board's finding that Clark aided and abetted an unauthorized person to practice architecture is wrong as a matter of law.

**Issue 2:** Was the Board wrong as a matter of law in finding that Clark signed and sealed drawings for which he did not have professional knowledge and direct supervisory control?

In the Maryland Architects Act, the Maryland Legislature established a regulatory system governing the practice of architecture in Maryland. Md.Code Ann., Bus. Occ. & Prof. §§ 3–101 to 3–701 (1995 Repl.Vol.). The Board found that Clark violated section 3–311(a)(1)(iv), which provides in pertinent part:

(a) Discretionary.—(1) Subject to the hearing provisions of § 3–313 of this subtitle, the Board, on the affirmative vote of a majority of its authorized membership, may deny a license to any applicant, reprimand any licensee, or suspend or revoke a license if:

. . .

(iv) the applicant knowingly violates any provision of the code of ethics adopted by the Board.

The code of ethics provision that the Board found Clark violated is set forth in Code of Maryland Regulations (COMAR) 09.21.01.05E(1).[6] It provides in pertinent part that "an architect may not sign or seal drawings, specifications, reports, or professional work for which he or she does not have direct professional knowledge and direct supervisory control."

Evaluation of this issue involves interpretation of COMAR 09.21.01.05E(1) and the meaning of the words "direct professional knowledge and direct supervisory control." Interpretation of an agency rule is "governed by the same principles that govern the interpretation of a statute." *Maryland Comm'n on Human Relations v. Bethlehem Steel Corp.*, 295 Md. 586, 593, 457 A.2d 1146 (1983). Thus, a regulation must be construed so as to "ascertain and carry out the intent of" the promulgating agency. *Montgomery County v. Buckman*, 333 Md. 516, 523, 636 A.2d 448 (1994). To do so, the court will consider the language of the regulation and give that language its natural and ordinary meaning. *Buckman, supra*, 333 Md. at 523, 636 A.2d 448; *Harford County v. University of Md. Medical Sys. Corp.*, 318 Md. 525, 529, 569 A.2d 649 (1990). If a statute or regulation is unambiguous, the court need not look beyond the regulation or statute itself to identify the intent of the legislature or promulgating agency. *Buckman, supra*, 333 Md. at 523, 636 A.2d 448; *In re Criminal Investigation No. 1–162*, 307 Md. 674, 685, 516 A.2d 976 (1986). Moreover, a statute or regulation is to be read "so that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless, or nugatory." *Buckman, supra*, 333 Md. at 523–24, 636 A.2d 448; *State v. 149 Slot Machines*, 310 Md. 356, 361, 529 A.2d 817 (1987).

An "agency is best able to discern its intent in promulgating a regulation." *Bethlehem Steel, supra*, 295 Md. at 593,

---

**6.** Section 3–205 of the Maryland Architects Act grants the Board authority to adopt a code of ethics for practicing architecture.

457 A.2d 1146. Normally, an agency's "interpretation of the meaning and intent of its own regulation is entitled to deference." *Changing Point, Inc. v. Maryland Health Resources Planning Comm'n,* 87 Md.App. 150, 160, 589 A.2d 502 (1991). Appellant, therefore, asserts that, because of the Board's expertise in the regulation of the practice of architecture, the Board's interpretation of COMAR 09.21.01.05E(1) is entitled to deference.

In the instant case, however, the Board's February 22, 1995, order fails to provide any explanation of the Board's interpretation of COMAR 09.21.01.05E(1). Specifically, the Board provides no guidance as to how it construed the words "direct professional knowledge and direct supervisory control" in the regulation. Rather, the Board merely concludes that Clark violated COMAR 09.21.01.05E(1). Such a broad legal conclusion is entitled to no deference.

 Appellant asserts that "Clark's after the fact, limited involvement" amounts to "failure to have direct knowledge and supervisory control over" the work of Vincent, an unlicensed individual. A plain reading of COMAR 09.21.01.05E(1) reveals that the regulation merely requires that, in order to affix his or her seal, an architect must have "direct professional knowledge and direct supervisory control" over the drawings or reports. The regulation does not require that an architect have "direct supervisory control" over the person who originally prepared the drawing.[7] Nor does the regulation require

---

7. A comparison of the language of Section 6.05, Chapter VI, of the Rules and Regulations adopted by the Texas Board of Architectural Examiners, with COMAR 09.21.01.05E(1) is instructive. Section 6.05 states that "no registrant shall affix the seal ... to sketches, working drawings, specifications, or other documents *developed by others not under the direct and continuing supervision* and not subject to the authority *of that registrant* in critical professional judgments." *Piland v. Texas Bd. of Architectural Examiners,* 562 S.W.2d 26, 27 (Tex.Civ. App.1978) (quoting rule) (emphasis added). In *Piland, supra,* the Texas Court of Civil Appeals interpreted the Texas Board of Architectural Examiners' rules regarding the use of an architect's seal. The Court of Civil Appeals held that section 6.05 "clearly permits use of an architect's seal on the work of another person *only* when that person is

that an architect have supervisory control over every aspect of a drawing from the time of its creation until the stamp is affixed upon it.[8] Rather, the regulation merely requires that the architect have "direct professional knowledge" and "direct supervisory control" over the final product upon which the architect affixes his or her seal.

Under section 3–501(a) of the Maryland Architects Act, a licensed architect is permitted to affix his or her seal to drawings when the architect has *either prepared or approved* the document. Md.Code Ann., Bus. Occ. & Prof. § 3–501(a) ("the licensed architect who prepared or approved the document shall sign, seal and date the document"). Thus, the Legislature has unambiguously acknowledged that an architect need not supervise every aspect of a drawing prior to certifying it. If an architect, after review, "approves" a document, he or she is permitted to stamp that document.

■ Section 3–102 of the Maryland Architects Act provides that the purposes of the Act "are to safeguard life, health, public safety, and property and to promote the public welfare by regulating persons who practice architecture in the State."

---

'under the direct and continuing supervision' of the registered architect and is *subject to the authority of that registrant in critical, professional judgments.'* *Id.* at 28. Conspicuously absent from COMAR 09.21.01.05E(1) is the requirement, as in the Texas rule, that the *persons* who prepare the documents must be under the supervisory control of the architect who affixes the seal.

8. Appellant asserts that *Markel v. Florida State Bd. of Architecture*, 268 So.2d 374 (1972), is "strikingly similar" to the case at bar. We disagree. In *Markel*, an architect's license was revoked after a hearing examiner found that Markel had sealed drawings "which he had not prepared and which were not prepared under his 'responsible supervising control.'" *Id.* at 375. The statutory sections violated by Markel differ considerably from COMAR 09.21.01.05E(1). Sections 467.14(1)(c) and 467.15(2), Florida Statutes Annotated, "prohibit an architect from affixing ... his [or her] seal or name 'to any plan, specification, drawing, or other related document which was not prepared by him [or her] or under his [or her] responsible supervising control.'" *Id.* (citation omitted). In contrast, COMAR 09.21.01.05E(1) only requires that an architect have "direct supervisory control" over the document; it does not require that the document be *prepared* under the architect's "supervising control."

Maryland's interest in promoting public safety is adequately promoted if an architect signs plans he or she did not personally author, so long as the architect reviews the drawings and makes necessary changes to ensure that the building is safe.

In the instant case, Clark clearly had "direct professional knowledge" and "direct supervisory control" of both the TCBY and the Dr. Ross building drawings. Neither of the drawings, as finally approved by Clark, were alleged to be unsafe or otherwise defective. In regard to the TCBY project, Clark "carefully" reviewed Vincent's drawings and drew "over certain portions of Vincent's work." This finding was supported by Clark's testimony that he "went over every detail on those [TCBY] drawings before they left my office" and that he "checked all the codes" and "checked the egress" and handicapped requirements. The Board also acknowledged that it was only after Clark determined "that the resultant drawing was correct" that he stamped the TCBY drawing. In regard to the Dr. Ross building, the Board found that "after reviewing the drawings and making several corrections and notations to them," Clark stamped each drawing. In addition, Vincent testified that portions of the addition, which was already under construction, had to be "ripped out" in order to comply with Clark's changes.

Based on the undisputed evidence, we hold that the Board erred, as a matter of law, in concluding that Clark did not have direct professional knowledge and direct supervisory control over the drawings upon which he affixed his seal.

**JUDGMENT AFFIRMED;**
**COSTS TO BE PAID BY APPELLANT.**