600 A.2d 1126

**Dexter Harvey BROWN**

v.

**STATE of Maryland.**

**No. 319 Sept. Term, 1991.**

Court of Special Appeals of Maryland.

Jan. 31, 1992.

Mark Colvin, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Ann N. Bosse, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Alexander Williams, Jr., State's Atty. for Prince George's County Upper Marlboro, on the brief), for appellee.

Submitted before ALPERT, BELL, and DAVIS, JJ.

DAVIS, Judge.

Dexter Harvey Brown (appellant) was convicted by a jury in the Circuit Court for Prince George's County (Missouri, J.) of voluntary manslaughter and use of a handgun in the commission of a felony. He was sentenced to a total of thirty years imprisonment for the two offenses. In this appeal, the following questions are presented for our review:

1. Did the appellant properly preserve for appellate review the issue of the admissibility of the gun found in the motel room?

2. Did the trial court err in admitting evidence of a gun found in a motel room two months after the shooting?

3. Did the trial court err in instructing the jury with regard to the crime of voluntary manslaughter?

## FACTS

The evidence presented revealed that at approximately 2:30 a.m. on June 24, 1990, Nathaniel Fogle sold a "30 piece" of cocaine to Steven Moran in a hallway outside of an apartment located at 5225 Marlboro Pike in Prince George's County. Moran then went outside to smoke the cocaine with Jack Davern and Davern's girlfriend, Sharon Chadwick. A short time later, Moran approached Fogle and demanded his money back. When Fogle refused to refund his money, an argument ensued.

While they were arguing, Fogle and Moran were approached by the appellant, an unidentified man, and Cynthia Raum. Raum asked Fogle if he was all right, to which he replied, "Yes." The trio then walked past Fogle and Moran to the steps of the apartment building. Once reaching the steps, Raum then turned and shouted, "[T]hat's the one right there, bust him, Dexter, bust him, Dexter...." The appellant then pulled out his gun, pointed it at Moran's head, and walked Moran back to his car, where Davern was standing. The appellant then began shooting.

The appellant's first shot missed both Moran and Davern. Moran then pulled Davern in front of him, as the appellant fired another shot. The appellant's second shot struck Davern, who ran a few feet before collapsing. The appellant then ran over to where Davern had fallen and shot him again. Two spent bullets were recovered from the scene.

The appellant testified that when Raum yelled, "[T]hat's the one right there, bust him, Dexter, bust him, Dexter ...," Davern got out of Moran's car with a baseball bat in hand. The appellant further testified that Davern struck him once with the bat and attempted another swing before the appellant shot Davern and fled the scene.

On August 24, 1990, the appellant and his girlfriend, who was pregnant at the time, were arrested in connection with the shooting. A .357 caliber handgun was recovered during a search of the room where the appellant was arrested. During questioning, the appellant initially stated that he

was present at the time of the shooting, but he was not the shooter. The appellant subsequently gave a statement in which he stated that a white man had come towards him swinging a baseball bat. The appellant's statement went on to say that when he saw the man with the bat coming towards him, he "flicked off" and when he came to his senses, he was standing, holding a gun. At trial, the appellant denied possession of the gun. The appellant explained that the reason he had earlier admitted to shooting Davern was to protect his girlfriend from indictment on gun and cocaine charges and from losing their baby upon arrest.

Prior to trial, the appellant made a motion in limine to suppress evidence of cocaine and the .357 caliber handgun found in the motel room at the time of the appellant's arrest. The appellant pointed out that no ballistic tests were done on either the gun found in the room or on the two spent shells found at the scene. The appellant argued that, since there was no evidence to link the gun to the bullets that were found, the prejudicial effect of evidence of the handgun, though relevant, far outweighed any probative value and thus it should not be admitted. The State argued that evidence of the gun was relevant because the bullets found at the scene "[c]ould have been fired from the type of gun found" in the motel room. The trial court denied the appellant's Motion to Suppress.

## DISCUSSION

### Preservation for Review

The appellee argues that the issue of whether the trial court erred in admitting evidence of a gun found in a motel room two months after the shooting is not properly preserved for our review. We agree and, therefore, do not reach that issue.

Maryland Rule 4–323 provides, in pertinent part:

(a) **Objections to Evidence.**—An objection to the admission of evidence shall be made at the time the evidence

is offered or as soon thereafter as the grounds for objection become apparent. *Otherwise, the objection is waived....*

**(b) Continuing Objections to Evidence.**—At the request of a party or on its own initiative, the court may grant a continuing objection to a line of questions by an opposing party. For purposes of review by the trial court or on appeal, the continuing objection is effective only as to questions clearly within its scope.

(Emphasis added.)

The appellant made a motion in limine to suppress evidence of the handgun found in the room at the time of his arrest. The trial court denied that motion. The appellant apparently recognized that a motion in limine is not a ruling on the evidence but is merely a procedural step prior to the offer of evidence, which serves the purpose of pointing out before trial certain evidentiary rulings that the court may be called upon to make. *Funkhouser v. State,* 51 Md.App. 16, 440 A.2d 1114 (1982). The appellant made a timely objection to the evidence of the handgun when the appellee sought to introduce it at trial.

The appellant, however, failed to object when the evidence was introduced at subsequent points in the proceedings. An objection is deemed waived unless timely made. Md.Rule 4–323.

At trial, when the State sought to introduce evidence of the handgun, the following colloquy took place:

STATE: When you were arrested in a motel room there was a gun in that room?

DEFENSE COUNSEL: Objection.

THE COURT: Overruled.

    . . . .

STATE: Was the gun someone else's gun?

APPELLANT: The coke was mine. I'm not going to lie.

    . . . .

STATE: But the gun was not yours?

APPELLANT: No, it wasn't mine, but I mean—

STATE: The gun was yours—

. . . .

APPELLANT: No, sir it did not belong to me.

STATE: Alright. Did you know the gun was underneath the mattress?

APPELLANT: Yes, sir.

STATE: Did you place the gun there?

APPELLANT: I placed it from the other mattress under that mattress, yes, sir.

. . . .

STATE: But that was not the gun you had in your possession on the day of the shooting occurring?

APPELLANT: No, sir.[1]

At no point during this exchange did defense counsel make an objection to this line of questioning. For his objections to be timely made and thus preserved for our review, defense counsel either would have had to object each time a question concerning the gun was posed or to request a continuing objection to the entire line of questioning. As he did neither, his objection is waived, and the issue is not preserved for our review.

### Jury Instruction on Voluntary Manslaughter

■ The appellant next complains that the trial court erred in instructing the jury with regard to the crime of voluntary manslaughter.

The appellant asserts that voluntary manslaughter is a specific intent crime and therefore the trial court erred in instructing the jury that manslaughter is a general intent crime. The appellant further contends that, since voluntary intoxication is a defense to specific intent crimes, the trial court should have instructed the jury that the appellant's

---

1. The appellant's testimony goes on to discuss the caliber of the gun found in the room at the time of the appellant's arrest, and the appellant identifies it as the gun recovered from the room when he was arrested.

intoxication was a mitigating circumstance in the present case. The trial judge instructed the jury that

[y]ou also heard testimony in this case, folks, and your recollection of that testimony will prevail, having to do with intoxication. The Defendant said he had been drinking on that occasion. I now instruct you you have heard evidence that the Defendant acted while intoxicated by alcohol. Generally voluntary intoxication is not a defense. However, when charged with an offense requiring a specific intent *the Defendant cannot be guilty if he was so intoxicated at the time of the act that he was unable to form the necessary intent. In this case, the specific intent offense is murder in the first and second degrees.*

For the offense of murder in the first and second degree the State must prove that the Defendant acted with the specific intent to kill. A person can be drinking and can even be intoxicated but still have the necessary mental faculties to act with a specific intent. In order to convict the Defendant the State must prove beyond a reasonable doubt that the degree of the intoxication did not prevent the Defendant from acting with a specific intent.

Speaking of specific intent, I now instruct you as to that. The Defendant is charged with the crimes of *first and second degree murder, an element of which requires specific intent* ...

You are instructed that *you must find the element of specific intent before the Defendant can be convicted.* If the State does not prove beyond a reasonable doubt that the Defendant acted with the required specific intent, you must find the Defendant not guilty.

The manslaughter charge carries a different intent along with the use of a handgun, and *that is what we call general intent....* [Emphasis supplied.]

Appellant's counsel excepted to these instructions, stating:

[T]he third exception is that when you instructed on specific intent and voluntary intoxication you told the jury that it did not apply to voluntary manslaughter and since this is not the reckless disregard type of case, I think there is intent to kill or at least intent to do grievous bodily harm, it's not necessarily excluded from it.

Appellant in his brief refers to our decision in *Cirincione v. State*, 75 Md.App. 166, 171–72 n. 1, 540 A.2d 1151 (1988), in which Judge Moylan observed:

There seems to be a paradox here, but careful recent analysis has resolved the apparent dilemma. Intoxication sufficient to erode the capacity to form a premeditated specific intent to kill (first-degree murder) would, *ipso facto*, erode the capacity to form a non-premeditated specific intent to kill (second-degree murder under a self-contradictory and illogical but nonetheless firmly established legal fiction that there could be a "conscious, fully formed and purposeful" intent to kill that would somehow not satisfy the watered-down definitions of "deliberate" and "premeditated"). One incapable of arriving at a decision (to kill) slowly is hardly capable of arriving at the same decision instantaneously, yet that is just what a hasty glance at the case law would seem to suggest. The principle that the absence of specific intent could preclude conviction for any crime requiring a specific intent—any of the attempts, any of Maryland's aggravated assaults, burglary, larceny, robbery, etc.—save only second-degree murder predicated upon the specific intent to kill would be bizarre.

The logical explanation as to why voluntary intoxication may negate first-degree murder but not second-degree murder has been provided by W. LaFave & A. Scott, *Criminal Law* (1972). Recognizing that there are four forms of murderous *mens rea*—1) intent to kill, 2) intent to inflict grievous bodily harm, 3) felony-murder, and 4) depraved-heart—the authors have explained that the absence of a specific intent to kill would, of necessity, obviate a conviction for that variety of murder in either of

its degrees but could nonetheless support a second-degree murder conviction upon the "depraved-heart" theory, which requires only wanton recklessness and does not require any specific intent.

> "Doubtless a better explanation is that one may be guilty of second degree murder, in most jurisdictions which divide murder into two degrees, by killing without any intent to kill or injure but with a high degree of recklessness (the "depraved heart" type of murder), and, as we shall see below, although intoxication can negative a required intention, it cannot (by the majority view) negative recklessness." *Id.* at 345.

> "The real difficulty concerns the intoxicated person who conducts himself in a very risky way but, because of his drunkenness, fails to realize it. If his conduct causes death, should he escape murder liability? The person who unconsciously creates risk because he is voluntarily drunk is perhaps morally worse than one who does so because he is sober but mentally deficient. At all events, the cases generally hold that drunkenness does not negative a depraved heart by blotting out consciousness of risk, and the Model Penal Code, which generally requires awareness of the risk for depraved-heart murder (and for recklessness manslaughter), so provides." *Id.* at 545.

Thus, the erosion, through voluntary intoxication, of the specific intent to kill does not, as *Chisley v. State*, . . . [202 Md. 87, 95 A.2d 577 (1953)], may have unwittingly suggested, move the crime *down* from a higher level of blameworthiness (first degree) to a lower level of blameworthiness (second degree) within the context of the same murderous *mens rea* (intent to kill), but rather moves the crime *down and over* from a murderous *mens rea* requiring a specific intent to a different murderous *mens rea* not requiring such specific intent. It is an inescapable fact that even second-degree murder *of the intent-to-kill variety* is a specific-intent crime.

This explanation is completely compatible with what the Maryland case law has done. The only failing of the case law was the lack of a satisfactory doctrinal explanation of why it did what it did.

■ Relying on the above footnote from *Cirincione*, appellant concludes that "manslaughter requires a specific intent to kill, or at the very least, a specific intent to inflict grievous bodily harm" unlike second degree murder. Voluntary manslaughter is defined as "an intentional homicide, done in a sudden heat of passion, caused by adequate provocation, before there has been a reasonable opportunity for the passion to cool." *Cox v. State,* 311 Md. 326, 331, 534 A.2d 1333 (1988) (citations omitted). Imperfect self-defense may also result in a voluntary manslaughter conviction where the killer had a subjectively honest but objectively unreasonable belief that he was in deadly peril. *State v. Faulkner,* 301 Md. 482, 506, 483 A.2d 759 (1984).

■ From the footnote in *Cirincione*, it is clear that voluntary manslaughter is a specific intent crime and, of course, it logically follows that the trial judge erred in instructing the jury that it is a general intent crime. That the trial judge incorrectly stated the law to the jury, however, is unavailing to the appellant for several reasons.

We reiterated the law concerning voluntary intoxication as a defense to murder and manslaughter succinctly in *Jones v. State,* 37 Md.App. 511, 526, 378 A.2d 9 (1977) (emphasis supplied):

Almost 25 years ago the Court of Appeals, in *Chisley v. State,* 202 Md. 87, 95 A.2d 577 (1953), said, at 106, that "voluntary intoxication will not reduce murder to manslaughter *nor will it excuse the crime.*" That rule has been followed in Maryland without deviation. See *Bateman v. State,* 10 Md.App. 630, 272 A.2d 64, *cert. denied,* 261 Md. 721 (1971).

While most of the authorities discuss whether voluntary intoxication will reduce second degree murder to manslaughter, it is nonsensical to suggest that intoxication will

not negate the *mens rea* requisite for a conviction of second degree murder but will negate the *mens rea* required for a lesser offense, *e.g.*, voluntary manslaughter.

Considering this anomaly in a case where the defendant sought to negate the intent required for voluntary manslaughter, the Supreme Court of Pennsylvania said in *Commonwealth v. Bridge*, 435 A.2d 151, 156–57, 495 Pa. 568 (1981) (emphasis supplied) (citations omitted):

> Thus since the issue was the sufficiency of the provocation, the trial court would have been sustained for excluding testimony relating to intoxication for this purpose even if the verdict returned was a degree of murder. It necessarily follows that if the challenged evidence was not relevant to reduce the degree of homicide to voluntary manslaughter, which appellant gratuitously [sic] received from the jury, it was also not relevant to reduce the offense to an even lesser degree of manslaughter.
>
> Appellant seeks to focus the attention on *the volitional aspect of voluntary manslaughter and argues that the degree of intoxication would reflect an involuntary act thus justifying its relevance.* The fallacy in that position is that if the evidence failed to provide a basis for negating the malicious state of mind it obviously would not establish a *non malicious,* non volitional act. Even accepting that appellant proved his claimed "serious" provocation on the part of the victim, his malicious response would not constitute involuntary manslaughter. At best a non-intended result springing from a callous and reckless act would be established and a verdict of murder would have been justified. The constitutional claim dependent upon a showing of a preclusion of a legitimately relevant fact cannot here be demonstrated.

The footnote from *Cirincione,* cited by appellant, posits that there are four categories of murder, *i.e.*, intent to kill, intent to do grievous bodily harm, felony murder, and depraved heart. Proceeding, as we must, from second degree murder of the intent-to-kill variety, the prosecution must sustain its burden to demonstrate that the killing was

premeditated, deliberate, and with malice in order to secure a conviction for murder in the first degree. Although a defendant has no burden of persuasion under *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), he must shoulder his burden of going forward with evidence to mitigate the crime to non-culpable homicide or manslaughter once the State has offered proof of second degree murder and/or first degree murder. The law is clear that voluntary intoxication will only reduce first degree murder to second degree murder while a finding that an accused acted in the heat of passion in response to legally adequate provocation or imperfect self-defense will reduce the homicide to manslaughter. The trial judge in the case *sub judice* instructed the jury that first degree murder and second degree murder were specific intent crimes, and he further instructed the jury that "[t]he defendant cannot be guilty if he was so intoxicated at the time of the act that he was unable to form the necessary intent." The trial judge did not instruct the jury that, under Maryland law, voluntary intoxication is not a defense to second degree murder. Thus, the jury was free to consider whether voluntary intoxication negated the appellant's ability to form the requisite intent for both first and second degree murder, and the jury may well have returned a manslaughter verdict on the basis of voluntary intoxication, heat of passion, or imperfect self-defense.

The jury in the case *sub judice* is presumed to have followed the court's instruction. Had the jury been properly instructed that voluntary intoxication was not a defense to second degree murder and had the jury further understood that, if they were persuaded that appellant was so intoxicated that he was unable to commit an intentional killing, then the proper verdict would have been second degree murder of the depraved heart variety, rather than voluntary manslaughter.

Assuming, on the other hand, that the jury was persuaded that the appellant acted in the heat of passion or from a subjective, though unreasonable belief that he was

in imminent peril, the evidence of intoxication simply becomes irrelevant because the level of blameworthiness would already have been lowered to manslaughter by the jury's consideration of evidence that he was provoked or that he could claim imperfect self-defense. In other words, appellant has actually received more than that to which he was entitled under the court's instructions because the jury could return a verdict on the basis that he was unreasonably defending himself or acting in the heat of passion or because they believed he was intoxicated, although the law would have required a verdict of second degree murder upon the latter finding.

Appellant now seeks to have voluntary intoxication considered a second time to negate his volitional state under voluntary manslaughter when presumably the jury has already taken it into consideration. He cannot receive a bonus in the form of additional consideration simply because he advances three theories of defense which operate concurrently to affect criminal responsibility.

Indeed, there is ample authority for the proposition that a defendant's intoxication below the level of second degree murder is an aggravating circumstance which renders him more, rather than less, culpable. W. LaFave and A. Scott, *Criminal Law* (2d ed. 1972), p. 659 observes:

> Even more clearly, he does not qualify for the voluntary manslaughter treatment where, because of intoxication, he easily loses his self-control; that is to say, he is to be judged by the standard of the reasonable sober man.

Although voluntary manslaughter is defined as an intentional killing and thus technically qualifies as a specific intent crime, LaFave and Scott discusses the state of mind of the accused:

> Most killings which constitute voluntary manslaughter are of the intent-to-kill sort—so much so that voluntary manslaughter is often defined in the cases (and, sometimes, by statute) as if intent to kill were a required ingredient. *But, theoretically at least, they might be of*

*the intent-to-do serious-bodily injury, or of the depraved heart, types.* Thus—to take the most common sort of voluntary manslaughter, a killing while in a reasonable "heat of passion"—in most cases the defendant intentionally kills the one who has aroused this passion in him. But if, in the throes of such a passion, he should intend instead to do his tormentor serious bodily injury short of death, or if he should, without intending to kill him, endanger his life by very reckless (depraved heart) conduct, the resulting death ought equally to be voluntary manslaughter rather than murder or no crime. Thus, the great majority of modern statutes, either by a reference to all cases which would otherwise be murder or by similar general language, take this broad view.

The usual view of voluntary manslaughter thus presupposes an intent to kill (or perhaps an intent to do serious injury or to engage in very reckless conduct), holding that in spite of the existence of this bad intent the circumstances may reduce the homicide to manslaughter.

LaFave and Scott, § 7.10(a), p. 653 (footnotes omitted; emphasis added.)

Finally, while a criminal defendant has every right to advance inconsistent theories, the Court of Appeals in *Sims v. State,* 319 Md. 540, 550–51, 573 A.2d 1317 (1990), noted the practical problems sometimes inherent:

Although as a legal matter there is no bar to putting forth different or inconsistent theories of defense, there will often be practical problems of proof, particularly where different theories involve proof of different mental states on the part of the defendant. Where, for example, a particular subjective belief is required, a defendant who testifies that he was not present may find it difficult or impossible to adduce evidence that will fairly support the required finding. Indeed, that is the crux of the problem facing the defendant in this case.

The appellant has received, by the jury's verdict of manslaughter, the benefit of his defense that either his actions constituted imperfect self-defense or he acted in hot blood

in response to adequate provocation. These defenses contemplate an accused having formed the specific intent to kill, but that intent is ameliorated by an irrational state of mind. Appellant now asserts that the jury should have been able to consider whether he was too inebriated to form the specific intent to kill, which is contradictory to the jury's presumed finding that he did act *intentionally* in the heat of passion or imperfect self-defense.

Although we hold that it was error for the trial judge to instruct the jury that voluntary manslaughter is a general intent crime, the error was harmless beyond a reasonable doubt since voluntary intoxication is not a defense to the crime of voluntary manslaughter.

JUDGMENTS AFFIRMED.

COSTS TO BE PAID BY APPELLANT.