657 A.2d 342

**William L. SNYDER**

v.

**STATE of Maryland.**

**No. 481, Sept. Term, 1994.**

Court of Special Appeals of Maryland.

April 26, 1995.

534

George E. Burns, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief) Baltimore, for appellant.

Diane E. Keller, Asst. Atty. Gen., Baltimore (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Sandra A. O'Connor, State's Atty. for Baltimore County, Towson, on the brief), for appellee.

Submitted before MOYLAN, BISHOP and HOLLANDER, JJ.

BISHOP, Judge.

Appellant, William L. Snyder, was charged with first and second degree murder. A jury, sitting in the Circuit Court for Baltimore County, found appellant guilty of first degree murder. Appellant was sentenced to life imprisonment.

## Issues

Appellant raises the following questions, which we rephrase:

I.      Was the evidence sufficient to sustain appellant's conviction?

II.     Did the trial court err in admitting evidence of police speculation?

III.    Did the trial court err in allowing the State to question defense witnesses regarding prior bad acts of appellant?

IV.     Did the trial court err in allowing the State to question defense witnesses regarding prior statements made by the witnesses?

V.      Did the trial court err in refusing to allow appellant to consult with his attorney?

VI.     Did the trial court err in allowing State witnesses to testify that the victim had feared for her life?

VII.    Did the trial court err when it permitted appellant to discharge his attorney at the close of all the evidence, but before jury instructions and closing argument?

VIII.   Did the trial court err in denying appellant's motion for a new trial?

We answer appellant's second question in the affirmative and, thus, reverse and remand for a new trial. To the extent they have been preserved, we address several of the remaining questions for the guidance of the trial court. Rule 8–131(a); *Bedford v. State*, 317 Md. 659, 668, 566 A.2d 111 (1989).

*Facts*

On February 14, 1986, the victim, Frances Kay Snyder, left her house shortly after 6:00 a.m. to go to work; however, she never arrived at work that day. At approximately 2:30 p.m., the victim's husband, appellant, found his wife's body at the edge of a wooded area across the street from their residence. The victim had been bludgeoned. In 1993, appellant was convicted of murdering his wife, although the State had no forensic evidence connecting appellant with the murder. The State, rather, presented detailed testimony regarding appellant's actions on the day of the murder and subsequent to the murder. Among the State's witnesses were Tanya, Valerie, and Bonnie Snyder, and Robin Hock, daughters of appellant and the victim, and William Snyder, Jr., son of appellant and the victim.

Officer Robert Martin testified that, on the date of the murder, he went to appellant's home in response to a call for a cardiac arrest. When he arrived at the scene, the fire department was already present. Officer Martin testified that, "[the victim] was lying down in about a 6 foot ravine off of Clark Boulevard, so you really couldn't see the body until you were kind of on top of it." The victim's shattered eye glasses were found lying in the driveway of the Snyder residence. Near the eye glasses, the police found a blood spot, measuring about seven inches in diameter, in which there were also strands of dark hair and gray matter. There were also more blood spots in the road toward the driveway and on the far side of Clark Boulevard.

When Officer Martin arrived on the scene, the victim's car was parked in her driveway. Appellant advised Officer Martin that he had seen the car parked at Village Auto Body Shop, a nearby garage, and that he had driven it from the garage to the driveway. Appellant told Officer Martin that, after appellant parked the car in the driveway, he noticed something "that he thought was suspicious or something along in the woods." According to Officer Martin, appellant's comment was unusual because, standing in the driveway "and

looking into the woods toward where the body was lying[,] there was nothing that you could see.... There was nothing that would have le[ ]d me to believe that something out of the ordinary or the fact that there was a body back there. There was just nothing visible." Officer Martin testified that appellant had first told him that he had seen something suspicious in the woods when he got out of his wife's vehicle in the driveway, but then, appellant, while writing his statement, indicated that he "did not notice something suspicious in the woods until he was half way into Clark Boulevard." Officer Martin did not include in his report, however, where appellant showed him he had first seen the body.

On cross-examination, Officer Martin stated that he failed to note in his police report that nothing unusual could be seen from the vantage point of appellant's driveway. Officer Martin also acknowledged that nowhere in his police report did he include anything about a ravine or that the victim's body was below the level parallel to the plane of Clark Boulevard. Detectives William Ramsey and Milton Duckworth, the investigating homicide detectives, confirmed Officer Martin's observation that it was impossible to see the victim's body from the driveway because of its position twelve to fifteen feet behind two cars parked on the side of the road.

On the day of the murder, appellant made the following handwritten statement:

I woke up about 5 o'clock. My wife said she was running late would I make her coffee while she took her shower. I signed Valentine cards for the kids and hers and left them on the table. I started her car about 6 and came in the house. I put some clothes from washer into dryer jeans ... [—] laid down. I woke about 6:35 checked on Valerie and made her get up for work. I made her lunch bag and breakfast. She left at about 7:40[.] I believe my daughter Tanya was up at this time[.] [A]t about 8 o'clock I called Frank Smallwood [a/k/a "Adolph"] and asked him to drop me off at Fox to buy a 1975 Torino. I then called Balt[imore] Wash[.] Auction and got 3 numbers for cars for Tuesday's sale. Frank came[.] I woke Bonnie before I left

for Fox. I bought the Torino and came home. I woke Billy for work at about 9:20. I [went] outside to move a '74 Mustang that was stuck[,] it wouldn't start. Me and my son left for Fulton Auto Sales at about 10 o'clock. (I took shower prior to leaving). I left Fulton about 10:20 with my son to take a car to Fox Chevrolet. We then left and went to Russell Toyota to buy a part for '79 pick up truck, ordered part, waited until U[/]C manager was free. Me and my son bought a 1975 Ford wagon. I came home, arrived about 11:45. My daughter Bonnie had left for work about 5 minutes previous. My daughter Tanya was still here getting ready to go to doctor's. I waited for Tanya to get ready[,] folded some jeans and straightened up the house. I called Kay's work, spoke with someone named Bob. He said he hadn't seen her but didn't know if she was in or in that department today. About 12 [o'clock,] I became concerned. My daughter felt she went to the doctor[']s. After my daughter Tanya was ready we [rode] down Washington Boulevard to beltway and to BW Expressway out to Westinghouse looking for my wife's car. We then stopped at a card shop on Camp Meade Road. Tanya and I bought some candy and a card for her mother. I then took her to her doctor for exam about 1:45. We left the doctor's at 2:15[,] I took Tanya to my mother's[,] came towards house to look for doctor's phone number to find out if Kay was there or had appointment coming up Clark. I thought I saw her car in Village Auto Service[.] I asked where my wife was or what was wrong with her car or why was it here. I was told it had been there since about 8. I looked at car[.] [I]t seemed like no mechanical problem. I brought my '78 Datsun home then walked down and drove Kay's car up[.] I then noticed her purse and purse contents scattered about. Realizing something is wrong I started looking around. I noticed what I thought was red paint and then I noticed something not right across the street. I then crossed the street and saw it was Kay. She was half naked and bloodied. I tried to talk to her[.] I tried to cover her but her clothes wouldn't move. I ran to my house and called

911. The lady told me to hold on and go see if she was breathing and an ambulance was on the way. I think I checked her and couldn't tell first or second trip she told me to roll her over then the ambulance was there.

After making this statement, appellant was asked what made him look across the street. Appellant responded:

I don't know, I just panicked and noticed what I thought was red paint by the driveway. I think I was half way in the street when I noticed something wrong in the woods. I noticed what appeared to be, what looked like red paint and something else. I don't know what else it was, just something. I was just looking everywhere. When I came to check out the area I saw my wife.

Appellant denied that he and the victim were having marital problems, but admitted that, in the course of their marriage, they had been separated three times. The most recent separation was during the summer of 1985; however, appellant told Officer Martin that, since that reconciliation, "it had been great and getting better all the time."

Detective George Thiess, a Crime Unit officer, testified that the victim's body was found in a ravine, twelve to fifteen feet behind two vehicles parked on the far side of Clark Boulevard. Detective Thiess testified that the position of the victim's clothing indicated that the victim had been dragged to that location.

A search of the victim's car at the Baltimore County Police Department Headquarters produced various personal items, including a twenty dollar bill and the victim's purse, which contained more personal items and $59.55. From the trunk of the victim's car, the police recovered a "come-along," which is an automobile device used to secure, pull, and lift items. The come-along had a bent handle.

Tanya Snyder testified that, on February 14, 1986, at approximately 7:00 a.m. and 10:00 a.m., she phoned the victim at Westinghouse, where the victim was employed. The victim was not there. Tanya also testified that, when she first saw appellant that morning at approximately 10:30 a.m., he was

"slightly" concerned when he learned that the victim was not at work.

Around 1:00 p.m., appellant and Tanya drove the route that the victim usually took to work, but they could not find the victim. Afterward, appellant and Tanya went to buy Valentine cards. Tanya testified that, when she showed appellant the card that she had selected for the victim, appellant "read the card and paused for a moment then said that is nice and walked away." Tanya described appellant's reactions as "a little obscure" and stated that she was surprised by his reaction.

Tanya testified that appellant took her to her doctor's appointment and then to her grandmother's house, which was unusual because Tanya rarely went to her grandmother's house because her mother and grandmother "were never on very good terms." Tanya further testified that, when her parents fought, her mother would try to hit her father, but that her father would not hit her mother. According to Tanya, during the two weeks prior to her mother's murder, she did not recall any domestic disputes between her parents, and that the day prior to the murder, she thought that her mother was in good spirits.

Valerie Snyder testified that several unusual events occurred on the day of the murder. First, appellant, wearing only his underwear, awakened Valerie at approximately 6:45 a.m. This was unusual because the victim "didn't like [appellant] to come around us in his underwear." Secondly, appellant told Valerie that he was going to the store to buy her food for her lunch; Valerie said that this was unusual for appellant to do. Then, after using Valerie's car to drive to the grocery store, appellant, who always pulled into the driveway, backed the car into the driveway. Finally, appellant, rather than the victim, had purchased and signed their Valentine's Day cards. Valerie also testified that her parents fought often, and, that at her mother's funeral, appellant did not look "like he was sorry or that he was upset."

Bonnie Snyder testified that, on the day of the victim's murder, around noon, she noticed an indentation on her car door, "like someone had tried to pry open my door." She also testified that, on the day of the murder, she received a Valentine's Day card signed by appellant, although the victim normally signed the Valentine's Day cards. Bonnie contended that, when her parents fought, her mother was often the aggressor. Bonnie remembered a fight between her parents, before their separation in 1985, and testified that her mother threw pots and pans at appellant, and that appellant had held the victim by the throat "for a few seconds" until she calmed down.

Bonnie also testified that the come-along that was found in the victim's car was either her father's or brother's and that it was used to "tow cars out of the ditch [because a] lot of cars went over the hill when it was snowing." Bonnie indicated that, on occasion, the come-along would be in her mother's car "because they used my mom's car to pull people out of the ditches because my mom had a big heavy car."

Robin Hock confirmed that it was unusual that appellant backed Valerie's car into the driveway because "[n]o one ever backed a car into the driveway." Robin further testified that her parents separated from July to November, 1985, after the victim was treated at North Arundel Hospital for a bruised throat and neck resulting from an altercation with appellant. According to Robin, during this separation, appellant, the named beneficiary on the victim's life insurance policy, asked Robin if the victim intended to change the beneficiaries on her life insurance policy. Robin stated that the victim did want to remove appellant as a beneficiary and that the victim was scared of appellant.

Appellant received $170,250 in insurance proceeds as a result of his wife's death. Robin testified, however, that her "father was told by the insurance company [that] he was a suspect in the murder [and] that he would not be able to receive the funds from them. . . . [T]he only way that they would be released was if all 5 children signed papers releasing

all rights to the money for the rest of our lives.... He then offered ten thousand dollars to each child...." Robin testified that, after appellant received the insurance money, he loaned her an additional $10,000, which she did not repay because the victim "did not want [appellant] to have any of the insurance money and that [the victim] feared for her life and that was why she wanted to change it to begin with." Robin further testified that, approximately six months after the murder, appellant began seeing another woman and, shortly thereafter, she saw that woman dressed in the victim's clothing.

Vernon Frame, an attorney, testified that the victim had consulted him on July 30, 1985, about a divorce, at which time the victim had bruises on her face and a black eye. Frame filed a divorce complaint on behalf of the victim, which was later dismissed when appellant and the victim reconciled.

Albert Johnson, the victim's brother, testified that, approximately three weeks prior to the victim's death, appellant informed Johnson that he was "going to get rid of the victim...." Albert suggested that appellant move from the home and lease an apartment. Appellant, however, refused and stated that he had "to work something out here but I don't think I am going to be leaving [the family residence]."

Albert testified that, at the victim's funeral, appellant "was acting funny, like a clown, ... he just didn't act like the person that would—that someone's wife is laying in there in a casket, he was enjoying himself." At the funeral, appellant told Albert that, "if Tanya ... hadn't ... changed her statement from telling [me] that [the victim] wasn't at work at 7:30 in the morning, [I] would be in jail right now and ... I have got to watch what I say here because I don't want to change my story around."

Tanya Snyder had originally told the police that, at 7:00 a.m., she informed her father that the victim was not at work. She later told the police that she was incorrect and that she had not seen her father until 10:30 a.m. Notably, one week prior to the murder, the victim ran out of gas on her way to

work; when appellant learned that the victim was not at work, he began looking for her immediately. On the day of the murder, however, appellant waited until 1:00 p.m. to search for the victim.

According to Albert, appellant objected to Albert's offer to provide a $10,000 reward for information concerning the victim's murder. Albert stated that when Albert told appellant that he was offering a reward, because he wanted to find out who murdered his sister, appellant told him: "I don't think they will ever solve the case."

Albert testified that the victim rented a safe deposit box under her name and Albert's name. The victim kept both keys to the box and told Albert that under no circumstances was appellant to have access to the safety deposit box. Appellant called Albert the day after the victim's funeral, requesting access to the safe deposit box, which he mistakenly believed contained $4,300. When Albert asked appellant how he had a key, appellant told Albert that "[the victim] left it here in the kitchen cabinet and told me if I ever needed it, it would be there for me." Upon Albert's urging, appellant gave the key to the detectives. When the detectives opened the safe deposit box, they found two pieces of jewelry and $32.00. The second safe deposit key was found, in a red envelope, in the victim's tool box at Westinghouse.

Lois Johnson, the victim's sister-in-law, testified that, a few days after the funeral, Tanya Snyder was staying at her house. Appellant had called Tanya on the phone. After appellant and Tanya spoke, appellant had Tanya put Lois on the phone and said: "I want you to remember today because it may be the day that saves me." Lois stated that appellant was referring to Tanya's intention to tell the detectives that she was confused about what time it was that she had originally told appellant that the victim was not at work. Specifically, Tanya was going to tell the police that it was 10:30 a.m., and not 7:30 a.m., when she first saw appellant and told him that the victim was not at work.

Linda Johnson, the victim's sister-in-law, recounted a conversation that she had with appellant during his 1985 separation from the victim:

The phone rang this particular afternoon. I answered and [appellant] asked to speak to [the victim] and I said she is not here and I said furthermore I said I really don't think she will speak to you anyway. He says I don't know what her problem is and I said she thinks you are trying to kill her.

   *  *  *  *  *  *

He laughed and he said that is a joke, he said, because if I wanted to kill her all I would have to do is pay a couple hundred and I can have her knocked off like that.

Linda testified that, at the victim's funeral, appellant "was very cold, no remorse, no sorrow.... He didn't make eye contact, a very few times." Linda stated that when appellant was relaying the story of what happened on the day of the victim's murder, he was "[v]ery well rehearsed."

Willa Spreen, the victim's cousin, testified that, during the 1985 separation, the victim nervously discussed divorcing appellant and told her about the safe deposit box that she had with Albert. Willa testified that she saw the safe deposit box key on the victim's key ring. Willa further testified that, the night before the murder, the victim had called her and was very upset. "[The victim] said that—that [appellant] had threatened her before and that she—well, she had told him previously that she wanted him out of the house ... that she was afraid that he was going to kill her. [The victim] said that [appellant] made the statement that she was a dead woman."

William Harp, the owner of the Village Auto Body Shop, where appellant found the victim's car, testified that, when he opened the shop at 7:45 a.m. on the morning of the murder, the victim's car was parked on his lot; however, he did not know why the car was there. According to Mr. Harp, appellant arrived at the body shop around 10:00 a.m., claiming that, from his house, he had seen the victim's car parked there.

Mr. Harp testified that appellant left the body shop to try to locate his wife. Appellant returned later that day, told Mr. Harp that his wife was not at work and drove the victim's car back home.

Mr. Harp also testified to several visits that appellant made to his shop after the murder. During these visits, appellant expressed concern over the police investigation and urged Mr. Harp not to cooperate with the police. Mr. Harp noted that each time appellant came to the body shop to discuss whether the police had come to ask questions, appellant would "say they're never going to find out who did it." Mr. Harp also stated that, each time he would speak with appellant, "he would never show any interest in finding out the person who killed his wife."

Mr. Adolph Smallwood (a/k/a Frank), a witness for the defense, stated that he called appellant during the evening of February 13, 1986 about a car for sale at Fox Chevrolet. The next morning, Mr. Smallwood arrived at the Snyder residence at approximately 8:20 a.m., pulled into the driveway, honked the horn, and appellant came out of the house. The men went to Fox Chevrolet where appellant purchased a car and drove it away.

Mr. Smallwood testified that he never really talked to appellant about the victim's death, but that appellant had told him that he wished they could find out who killed the victim "so they would leave [me] alone." During cross-examination, Mr. Smallwood indicated that he had heard that appellant and one of his daughters had a "falling out" a couple of years after the victim had died because the daughter kept saying that appellant was involved with the death of his wife.

William Snyder, Jr., appellant's son, testified that he awoke a little after 9:00 a.m. on the morning of the murder and left the Snyder residence around 10:00 a.m. with his father. The two went to Fulton Auto Sales, Fox Chevrolet, Russell Toyota, and then William returned alone to Fulton Auto Sales. Shortly after 3:00 p.m., William returned home. William met appellant in the front yard and appellant told him that his

mother was across the street. William testified that, from where he was standing in the front yard, he was able to see the victim's feet. William further testified that, when he walked to the far side of Clark Boulevard, he could see up to the victim's knees.

William testified that he and appellant owned the come-along that was found in his mother's car, and that they had owned it for approximately six months prior to the victim's death. William testified that it was used for "anything," such as pulling vehicles out of ditches. When asked about the bend in the handle of the come-along, William explained that the come-along was cheap, and that any attempt to apply pressure when using it would cause the handle to bend. William further testified that the victim would get a violent temper when she became very upset.

Appellant presented several witnesses who testified to his good character for honesty, truthfulness, and peacefulness. Appellant himself testified, *inter alia,* that he did not go to the Village Auto Body Shop until sometime after 2:00 p.m. on the day of his wife's murder, that he did not kill his wife, that his wife told him about the safe deposit box, that she gave him a key so that he would have access to the safe deposit box, and that he never asked Albert Johnson to help him gain access to the box. Additional facts will be discussed *infra,* as necessary.

### Discussion

### I. Sufficiency of the Evidence

Appellant contends that the evidence was insufficient to sustain his conviction because the State's evidence consisted only of proof of motive and character assassination. Appellant claims that the "evidence fell far short of proving beyond a reasonable doubt that [he] was the criminal agent in the murder of his wife."

"Our function in reviewing the sufficiency of the evidence is to determine 'whether, after viewing the evidence

in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Traverso v. State,* 83 Md.App. 389, 395, 574 A.2d 923, *cert. denied,* 320 Md. 801, 580 A.2d 219 (1990) (citations omitted). The Court of Appeals, in *Tichnell v. State,* 287 Md. 695, 415 A.2d 830 (1980), explained the test used to determine whether a homicide was wilful, deliberate, and premeditated and thus in the first degree:

> For a killing to be "wilful" there must be a specific purpose and intent to kill; to be "deliberate" there must be a full and conscious knowledge of the purpose to kill; and to be "premeditated" the design to kill must have preceded the killing by an appreciable length of time, that is, time enough to be deliberate. It is unnecessary that the deliberation or premeditation shall have existed for any particular length of time. Their existence is discerned from the facts of the case.

*Id.* at 717–18, 415 A.2d 830. A conviction of first degree murder may rest on circumstantial evidence. The circumstances are considered collectively, "with the final analysis affording the basis of an inference of guilt beyond a reasonable doubt." *Wilson v. State,* 319 Md. 530, 536, 573 A.2d 831 (1990). Circumstantial evidence is viewed, " 'not like a chain which falls when its weakest link is broken, but ... like a cable ... [which] "does not depend upon one strand." ' " *Id.* (citations omitted). "When proof of fact is based on circumstantial evidence, the trier of fact need not be satisfied 'beyond a reasonable doubt of each link in the chain of circumstances relied upon.' " *Id.* (citation omitted).

▮▮▮ Weighing the credibility of the witnesses and resolving any conflicts in the evidence are tasks proper for the fact finder. *Binnie v. State,* 321 Md. 572, 580, 583 A.2d 1037 (1991). It is also the jury's function to resolve any evidentiary conflicts. *Colvin v. State,* 299 Md. 88, 112, 472 A.2d 953, *cert. denied,* 469 U.S. 873, 105 S.Ct. 226, 83 L.Ed.2d 155 (1984). In performing its fact finding role, the jury is free to accept the evidence that it believes and reject that which it does not

believe. *Muir v. State,* 64 Md.App. 648, 654, 498 A.2d 666 (1985), *aff'd,* 308 Md. 208, 517 A.2d 1105 (1986).

■ Based on the evidence in the case *sub judice,* we conclude that a rational trier of fact could have found appellant guilty of first-degree murder. Appellant gave the police inconsistent explanations for crossing the street where he found his wife's body. Appellant told the police that he was standing in his driveway and something unusual attracted his attention. Appellant's son testified that he could see his mother's feet and legs when standing on the front lawn of the Snyder residence and in the street; however, Detectives Duckworth and Ramsey and Officer Martin testified that it was impossible to see the victim's body from the driveway or the street because the body was in a ravine behind the vehicles parked on the road. Moreover, Martin, Ramsey, and Duckworth testified that they could not see anything unusual in the wooded area when standing in appellant's driveway at the location appellant claimed to have been.

The following evidence, if believed by the jury, was sufficient to give rise to a reasonable inference that appellant killed the victim: (1) appellant backed Valerie's car into the driveway, rather than pulling the car forward, as was his normal habit, thus concealing the victim's eye glasses and the spots of blood that Valerie would have seen when she left for work that day; (2) appellant was in his underwear when he woke Valerie, which was unusual because the victim frowned on such attire; (3) appellant signed the Valentine's Day cards for the children, a task normally performed by the victim; (4) appellant visited the Village Auto Body Shop around 9:00 or 10:00 a.m., which conflicted with appellant's claim that he did not discover the victim's car until the afternoon; (5) appellant waited several hours, after learning that the victim was not at work, before searching for her; however, in the week previous to the murder, when appellant had learned that the victim was not at work, he began searching for her immediately; (6) appellant possessed a safe deposit box key that Willa Spreen had seen on the victim's key chain in late August or early

September of 1985; however, testimony revealed that the victim did not want appellant to have access to the safe deposit box; (7) appellant made inquiries concerning the victim's insurance policy beneficiaries; the victim, however, did not want appellant to have any insurance money; (8) appellant and the victim had marital problems; and (9) the evening before the murder, the victim feared that appellant was going to kill her.

Moreover, appellant's discovery of the body, his conduct on the day of the murder, statements that he made before and after the murder, and his conduct subsequent to the murder, was sufficient to establish his guilt. This evidence, viewed in a light most favorable to the State, is sufficient to sustain appellant's conviction for first-degree murder.

## II. Police Speculation

Appellant contends that the trial court improperly admitted evidence of police speculation. We agree. During its case-in-chief, the State elicited that Detective Duckworth had asked appellant to come down to the Baltimore County Police Headquarters, during the week following the victim's murder, to try and clarify certain inconsistencies that had been noted during the investigation.

The following colloquy occurred:

[DETECTIVE]: Prior to [appellant] coming in and during the course of the investigation when we decided that we needed to bring him back in to clarify some points we prepared or I prepared, it's in my handwriting, a list of questions that we wanted to clarify with him. Do you want to know what they are?

Q: Did you make a list of the questions that you wanted to ask the defendant?

A: Yes, sir, I did.

Q: What did you intend on asking the defendant?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

THE WITNESS: What time did his daughter Tanya first tell him she tried to call her mother.

[DEFENSE COUNSEL]: I'm sorry, could you say that again?

THE WITNESS: What time did his daughter Tanya first tell him she tried to call her mother.

[DEFENSE COUNSEL]: Excuse me. May I interrupt? May I ask for a copy of this?

THE COURT: Come up here.

**(Counsel and defendant approached the bench.)**

THE COURT: What's that going to give you?

[DEFENSE COUNSEL]: I'm sorry.

THE COURT: What is that going to give you?

[DEFENSE COUNSEL]: I will just be able [to] see it without having to write down asking him to repeat on cross-examination. I mean clearly after he reveals what it is, [appellant] is going to have to explain. I just wanted to know if I could get a copy.

THE COURT: He will give you a copy after he testifies, after the next break.

**(Counsel returned to trial tables.)**

[PROSECUTOR]: I'm sorry, detective, go ahead what was the question that you wanted to ask the defendant?

A: What time did his daughter Tanya first tell him she tried to call her mother at work or tried to call her mother.

Second one was why, if last week, meaning the week prior to the murder, he called work and she wasn't there did he go look for her immediately and why he didn't go look for her immediately on Friday the 14th of February.

Why did he back Valerie's car into the driveway as opposed to pulling it in which is his normal procedure, his normal procedure.

How can he explain seeing something suspicious in the woods from Clark Boulevard when it is not possible.

Why did he take Tanya to her grandmother's before returning home.

Why did he call Smallwood for a ride when he had a car there and his son to drive it.

Why did he say he stopped in Village Auto with the Datsun then walk back down. Interviews at Village Auto indicated that the first time he came there was on foot and immediately drove the vehicle away.

Q: Did you give [appellant] an opportunity to explain his answers to those questions?

A: I never got an opportunity to ask him the questions. He said, he explained to us that he couldn't explain any inconsistencies and that he had told us the truth.

Q: Would you have provided him an opportunity to explain these inconsistencies?

A: Yes, sir, that was the purpose of the interview, to obtain fingerprints and to try and clarify these points.

Q: But he never answered your questions?

A: No, sir.

[DEFENSE COUNSEL]: Objection, move to strike.

THE COURT: Overruled, motion denied. Detective, does that piece of paper you referred to in your testimony, can we make a copy of that?

In *Crawford v. State*, 285 Md. 431, 404 A.2d 244 (1979), the trial court admitted the police interrogation of the defendant in its entirety. This included prejudicial commentary by the interrogating officers. The Court summarized the testimony:

The jury heard the police say that they interviewed people who said that the victim was terrified of the accused, scared of her because she was "so insanely jealous," that they had proof, "enough proof" of what actually happened, that "no matter how many times you hit us with that story 'I was in a struggle,' we know that's not what happened, we know."

*Id.* at 450, 404 A.2d 244. The Court held:

There is no doubt that the challenged comments of the police which were heard by the jury, whether in the form of questions, assertions of disbelief, opinions (not as expert witnesses), argument, recounting of what others were pur-

ported to have said contrary to the version of the accused, hearsay, or otherwise, tended to seriously prejudice the defense.

*Id.* at 451, 404 A.2d 244. The Court reversed the trial court on the grounds that admitting the statements by the police officers violated due process and rendered the trial fundamentally unfair. *Id.* at 451–53, 404 A.2d 244.

In the case *sub judice,* Detective Duckworth's testimony, in essence, put into evidence the detective's disbelief of appellant's statement regarding his activities, and the events surrounding his wife's murder, as well as the detective's opinion as to inconsistencies in appellant's statements.

> [W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict.

*Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665 (1976).

Applying this test to the case *sub judice,* we cannot say, beyond a reasonable doubt, that the admission of Detective Duckworth's testimony, concerning the questions that he wanted to ask appellant regarding certain "inconsistencies," did not contribute to the rendition of appellant's guilty verdict. "The nature of the objectionable matter, the [presentation] of it before the jury, and its direct adverse relation to the defense of the accused, lead inescapably to this conclusion." *Crawford,* 285 Md. at 455, 404 A.2d 244. The admission, into evidence, of these questions "clearly brought out the obvious disbelief of the police in [appellant's] version of what happened." *Id.* at 447, 404 A.2d 244.

### III. Prior Bad Acts

Appellant contends that the trial court erred in allowing the State to impeach several defense witnesses by asking ques-

tions regarding their knowledge of accusations that appellant had committed crimes. Appellant, relying on *Taylor v. State,* 278 Md. 150, 360 A.2d 430 (1976), contends that this cross-examination was improper because it inquired into "prior accusations of the accused."

In *Taylor v. State,* the Court of Appeals stated:

It has long been the rule of our cases that an accusation of crime, as distinguished from a conviction, may not be proved as a means of impeaching the testimony of a defendant who takes the stand in his own behalf. *The same rule has always been applied to the impeachment of any other witness, including one called as a character witness for a criminal defendant.*

\*       \*       \*       \*       \*       \*

We think that the identical rule should be applied to the cross-examination of a character witness called by the defendant, for if it is impermissible to question the defendant about a prior accusation, it should be similarly impermissible to question the defendant's character witness about that prior accusation of the accused, the potential for prejudice being the same and the relevance insignificant.

*Id.* at 157, 360 A.2d 430 (citations omitted) (emphasis added).

In *Winters v. State,* 301 Md. 214, 482 A.2d 886 (1984), however, the Court recognized a distinction between improper questions posed to the character witnesses that are directed to information concerning prior bad acts and proper questions that are asked in an effort to probe the veracity of the opinions offered and the witnesses' basis of knowledge in forming their opinions. *Id.* at 232, 482 A.2d 886. In other words, if the State is merely seeking to test the witnesses' knowledge, rather than inquire about a specific prior bad act, then such impeachment by cross-examination is not an abuse of discretion. *See id.* at 232–33, 482 A.2d 886.

### The Accusations of Bottling and Selling Illegal Whiskey

Harry and Carla Hoffman, character witnesses for appellant, testified that appellant was an honest, truthful

person. On cross-examination, they were asked if they would be surprised to learn that appellant was involved in the illegal bottling and sale of whiskey. In *Taylor*, the Court of Appeals held that the trial court erred in allowing the State to impeach the character witnesses in this manner, *i.e.*, with prior accusations against the appellant in which there were no convictions. The Court, however, went on to hold that

> any error of constitutional dimension which could have resulted from the cross-examination of [the appellant's] character witnesses was harmless beyond a reasonable doubt [because t]he character witnesses who were asked about [the appellant's] prior convictions denied knowledge of the convictions and then testified that if they had been aware of the convictions, their opinion of [the appellant's] reputation as a "peaceful" man would have remained unchanged. Thus, the State's use of the prior convictions failed to produce the desired result.

*Id.* 278 Md. at 158–59, 360 A.2d 430.

Similarly, in the case *sub judice*, the State's questions concerning the witnesses' knowledge of prior accusations that appellant illegally bottled and sold whiskey constituted harmless error beyond a reasonable doubt. Carla Hoffman testified that, even if that accusation were true, her opinion of appellant would not change. Harry Hoffman testified simply that he would be surprised to learn that appellant was involved in the bottling and sale of illegal whiskey.

Moreover, as was the case in *Winters*, the State in the case *sub judice* was merely seeking to test the witnesses' knowledge regarding appellant and explore the bases in formulating those opinions. Consequently, we perceive no prejudice to appellant by the trial court allowing these questions to be asked.

### The Accusations of Wife Beating

On cross-examination, the State asked Harry and Carla Hoffman and Irwin Wynn whether they had any knowledge of appellant having beaten the victim. Appellant's trial coun-

sel objected to some of these questions, but not to all of them. In *Brown v. State,* 90 Md.App. 220, 600 A.2d 1126, *cert. denied,* 326 Md. 661, 607 A.2d 6 (1992), this Court stated that, when an appellant makes a timely objection, but fails to object at subsequent points in the proceedings, an objection is deemed waived. *Id.* 90 Md.App. at 224, 600 A.2d 1126. In the case *sub judice,* for appellant's "objections to be timely made and thus preserved for our review, defense counsel would have had to object each time a question concerning [appellant's wife beating] was posed or to request a continuing objection to the entire line of questioning. As he did neither, his objection is waived, and the issue is not preserved for our review." *Id.* at 225, 600 A.2d 1126. See Rule 4–323.

## IV. Prior Statements

Appellant argues that the trial court erred in permitting the State to ask prejudicial questions, without an evidentiary basis. Appellant challenges three parts of testimony from two defense witnesses. We address each portion of the testimony.

### The Testimony of William Snyder, Jr., Appellant's Son

During William's cross-examination by the State, the following occurred:

Q. Billy, when you first got to 1843 Clark Boulevard that afternoon and you saw your father isn't it true that you looked at him and said you son of a bitch you did this, didn't you?

[DEFENSE COUNSEL]: Objection.

A. That's not true.

THE COURT: Overruled.

BY [PROSECUTOR]:

Q. That's not true, you didn't say that?

A. No.

Q. What did you say to him, Billy?

A. I didn't say anything.

Q. Were you angry at your father?

A. No.

Q. You weren't?

A. I didn't know what was going on. I had no idea.

Q. Are you saying that you were not angry at him?

A. No.

Officer Martin was called in rebuttal to provide an evidentiary basis for, what appellant calls, "the prosecutor's claim that Appellant's son accused him of being responsible for his mother's death." Officer Martin testified without objection:

Q: Officer Martin, on February 14, 1986 when you arrived at the crime scene did you see the defendant there?

A: Yes, sir, I did.

Q: Sometime after that did you have an occasion to see the defendant's son Billy?

A: Yes, sir, I did.

Q: Did you see the defendant walk up to his son Billy?

A: Yes, sir.

Q: Tell the ladies and gentlemen of the jury the first thing that happened.

A: First thing that happened when [appellant] walked up to his son he went to put his arm around his shoulder and Billy told him to get the hell away from him, walked off angrily and went into the next room.

Q: Was Billy angry at his father?

A: He appeared to be, yes.

Officer Martin's testimony made without objection, confirmed that William at least appeared to be angry with appellant and had verbally attacked him, despite William's testimony to the contrary. As discussed *supra*, in section III., for appellant's "objections to be timely made and thus preserved for our review, defense counsel would have had to object each time a question concerning [William's anger] was posed or to request a continuing objection to the entire line of questioning. As he did neither, his objection is waived, and the issue is not preserved for our review." *Brown*, 90 Md.App. at 225, 600 A.2d 1126. See Rule 4–323.

## The Cross–Examination of Adolph (Frank) Smallwood

During the cross-examination of Adolph Smallwood, the following exchange occurred:

Q: Do you remember having a conversation with Bernie Smith in September of 1989 in Tuggy's Bar?

A: I never had no conversation with him in September of '89.

Q: You never had any conversation with him at all in September of '89?

A: No.

Q: Mr. Smallwood, isn't it true that you told Bernie Smith in Tuggy's September of 1989 that when you picked up [appellant] that morning [appellant] was washing clothes and appeared to be nervous; didn't you tell Bernie Smith that?

A: No, I never.

Q: Isn't it true, Mr. Smallwood, that you told Bernie Smith that you believed—

[DEFENSE COUNSEL]: Objection.

BY [PROSECUTOR]:

Q: That [appellant] was washing blood out of his clothes; is that what you told him?

[DEFENSE COUNSEL]: Objection.

THE COURT: Overruled.

A: No, sir.

Q: You are saying that Bernie Smith isn't telling the truth, he made that up?

A: Yes, I am.

In *Bane v. State*, 73 Md.App. 135, 533 A.2d 309 (1987), this Court explained when a witness may be impeached by a prior inconsistent statement.

> Under Maryland law, a witness may be impeached by cross-examination to show that the witness previously made a statement contrary to the one made on the witness stand.

To impeach a witness by a prior inconsistent statement, a proper foundation must be laid. When using a previously made *oral* statement for impeachment, the cross-examiner must inform the witness of the time and place the statement was made, the person to whom it was made, and its substance.

\* \* \* \* \* \*

The purpose of laying a foundation is "to accord the witness the opportunity to reflect upon the prior statement so that he may admit it or deny it, or make such explanation of it as he considers necessary or desirable."

*Id.* at 154–55, 533 A.2d 309 (citations omitted).

■ In the present case, the witness was informed of the time and place that the statement was made, the individual to whom it was made, and the substance of the statement. The State laid the proper foundation to impeach the witness with the prior inconsistent statement and we perceive no error. Contrary to appellant's contention, it was not incumbent upon the State to have Bernie Smith testify at trial regarding the alleged statements that Adolph Smallwood made. There is no requirement that the State must introduce extrinsic evidence of the prior inconsistent statement after the witness denies having made the statement. Joseph F. Murphy, Jr., *Maryland Evidence Handbook*, § 1302(F)(2) at 677 (1989).

## The Recross–Examination of Adolph (Frank) Smallwood

■ On recross-examination, the State questioned Smallwood with regard to his grand jury testimony. Appellant's counsel objected at the end of the recross-examination and asked the trial court to instruct the jury that the questions asked by the State regarding the witness's grand jury testimony could be used only for purposes of impeachment. The trial court denied this request and stated that the State was only refreshing the witness's recollection and that the testimony had substantive evidentiary value.

In *Nance v. State*, 331 Md. 549, 629 A.2d 633 (1993), the Court of Appeals held that grand jury testimony may be admissible as substantive evidence if the declarant is "present as a witness at trial to be tested by cross-examination in regard to the former grand jury appearance and its contents." *Id.* at 571, 629 A.2d 633. Therefore, in the case *sub judice*, the trial court correctly denied counsel's request, ruling that the testimony had evidentiary value, even though it erroneously relied on the reasoning that the State was only refreshing the witness's recollection.

> [W]here the record in a case adequately demonstrates that the decision of the trial court was correct, although on a ground not relied upon by the trial court and perhaps not even raised by the parties, an appellate court will affirm. In other words, a trial court's decision may be correct although for a different reason than relied on by that court.

*Robeson v. State*, 285 Md. 498, 502, 403 A.2d 1221 (1979), *cert. denied*, 444 U.S. 1021, 100 S.Ct. 680, 62 L.Ed.2d 654 (1980).

## V. Attorney Consultation

■■■■ On August 26, 1993, at the close of proceedings for that day, appellant had not completed his testimony. The trial court stated:

> THE COURT: [Appellant], you're still on the stand, you have not had your cross-examination, you're, therefore, not allowed during the recess or overnight to talk to even [your attorney] about your testimony in this case; do you understand that?
>
> [APPELLANT]: I can't talk to my lawyer?
>
> THE COURT: No, not about the case, not about your testimony.

The next day, a luncheon recess was taken during appellant's cross-examination. The following exchange occurred between appellant's counsel and the trial court:

> [COUNSEL]: Your Honor, excuse me, am I still precluded from speaking to [appellant] or may I.

THE COURT:   About the case, you can't talk to him about his testimony.

We note that, because appellant's counsel did not object when the trial court ruled that appellant could not discuss the case or his testimony with his attorney, this question has not been preserved for our review.  Assuming, *arguendo*, that this question is properly before us, we perceive no error in the trial court precluding appellant and his trial counsel from discussing appellant's testimony.  We explain.

"[W]hen a defendant becomes a witness, he has no constitutional right to consult with his lawyer while he is testifying." *Perry v. Leeke*, 488 U.S. 272, 281, 109 S.Ct. 594, 600, 102 L.Ed.2d 624 (1989).  The Supreme Court explained:

> [W]hen [the defendant] assumes the role of a witness, the rules that generally apply to other witnesses—rules that serve the truth-seeking function of the trial—are generally applicable to him as well.  Accordingly, it is entirely appropriate for a trial judge to decide, after listening to the direct examination of any witness, whether the defendant or a nondefendant, that cross-examination is more likely to elicit truthful responses if it goes forward without allowing the witness an opportunity to consult with third parties, including his or her lawyer.

*Id.* at 282, 109 S.Ct. at 600–01.

In *Wooten–Bey v. State*, 318 Md. 301, 568 A.2d 16 (1990), the trial court recessed for lunch during the defendant's direct testimony.  The trial court did not preclude attorney-client contact, but ordered that the defendant and his attorney could not discuss the defendant's testimony.  The Court of Appeals, quoting at length from *Perry*, upheld the trial court's order, noting that the "trial judge here had the discretion to ensure the continuity of [the defendant's] direct testimony, to maintain the status quo, and limit the defendant's communication with his counsel concerning ongoing testimony." *Wooten–Bey*, 318 Md. at 309, 568 A.2d 16.

The Court of Appeals noted, however, that, because in an overnight recess, normal consultation between an attorney and

defendant would encompass matters that go beyond the defendant's own testimony, "[i]t is the defendant's right to unrestricted access to his lawyer for advice on a variety of trial related matters that is controlling in the context of a long recess." *Id.* at 308 n. 4, 568 A.2d 16. In the case *sub judice,* the trial court only prohibited appellant from discussing his testimony with his attorney. The trial court did not preclude all contact or discussions with trial counsel and did not interfere with appellant's constitutional right to discuss issues with his attorney regarding the availability of other witnesses, trial tactics, or the possibility of negotiating a plea bargain. *See id.* Accordingly, we perceive no error.

## VI. The Victim's Fear

Appellant next argues that the trial court erred in admitting testimony from his daughter, Robin Hock, and from Lois Johnson, the victim's sister-in-law. Both witnesses testified that the victim feared for her life and thought that appellant was trying to kill her.

▄▄▄ Appellant's counsel objected to Robin Hock's testimony that "[the victim] did not want [appellant] to have any of the insurance money and that she feared for her life and that was why [the victim] wanted to change [her insurance policy] to begin with." The State elicited this testimony after appellant's counsel questioned Robin regarding appellant's $10,000 loan to her from the insurance money that he collected, and her refusal to pay back the loan. The testimony that appellant's counsel objected to was Robin's explanation for her refusal to repay appellant. We agree with the trial court that appellant's counsel "opened the door" with respect to Robin's refusal to repay the money appellant lent her, and, therefore, the trial court correctly overruled the objection.

▄▄▄ Linda L. Johnson, the victim's sister-in-law, testified that, during the victim's separation from appellant in July of 1985, she spoke with appellant on the phone and told appellant: "I really don't think [the victim] will speak to you anyway ... she thinks you're trying to kill her." The trial

court erred when it overruled appellant's objection to Linda's testimony because her testimony concerns an out-of-court statement, testified to in court, and offered to prove the truth of the matter asserted therein. *Ali v. State*, 314 Md. 295, 304, 550 A.2d 925 (1988). The trial court's admission of this hearsay testimony, however, constitutes harmless error because "it was merely cumulative." *Changing Point, Inc. v. Maryland Health Resources Planning Comm'n*, 87 Md.App. 150, 172, 589 A.2d 502 (1991). We explain.

In addition to Linda's testimony, Willa Spreen testified about telephone conversations that she had with the victim. Without objection, Willa testified that

> [the victim] told me that nothing—that [appellant] hadn't changed, that nothing—she said nothing changed, he is just like he was.... And she became more and more—she said he has already tried to set me up to do—to kill me once and said this time he said I was a dead woman.

Additionally, Willa testified that, on the night before the victim's murder, the victim had said that she was "afraid that [appellant] was going to kill her." Both Linda's testimony and Willa's testimony establish that the victim was afraid appellant was going to kill her. Although the trial court should have sustained appellant's objection to Linda's testimony, the admission of her testimony "is not important" because it merely echoes Willa's testimony, to which appellant made no objection. *See Changing Point*, 87 Md.App. at 172, 589 A.2d 502 (holding that whether testimony admitted was hearsay was not important because the testimony was merely cumulative).

## VII. Discharge of Counsel

Appellant contends that the trial court abused its discretion in permitting him to discharge his trial counsel when only jury instructions and closing arguments remained before the close of the trial. Because we reverse the trial court's judgment and remand the case for a new trial, we shall not address the merits of this issue.

## VIII.   Motion for New Trial

Appellant's final contention is that the trial court erred in denying his motion for new trial.   Specifically, appellant argued that he did not receive effective assistance of counsel. As stated in section VII., *supra,* because we reverse and remand, we shall not address this issue.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY REVERSED AND REMANDED FOR A NEW TRIAL;   COSTS TO BE PAID BY BALTIMORE COUNTY.